NASCO, INC., Plaintiff–Appellee,

v.

CALCASIEU TELEVISION AND RA-
DIO, INC., and G. Russell
Chambers, Defendants–Appellants,

and

Richard A. Curry, Edwin A. McCabe,
and A.J. Gray, III, Appellants.

No. 89–4137.

United States Court of Appeals,
Fifth Circuit.

Feb. 6, 1990.

Robert G. Pugh, Pugh & Pugh, Shreveport, La. and Michael H. Rubin, Rubin, Curry, Colvin & Joseph, Baton Rouge, La., for Richard A. Curry.

Mack E. Barham and Robert E. Arceneaux, Barham & Associates, New Orleans, La., and Russell F. Tritico, Lake Charles, La., for Calcasieu Television and Radio, et al.

Michael G. Crow and Michael McGrath Duran, Adams & Reese, New Orleans, La., for Edwin A. McCabe.

John G. Torian, II and Bert Wilson, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for A.J. Gray, III.

John B. Scofield and David L. Hoskins, Scofield, Bargstedt, Gerard, Mount & Veron, Lake Charles, La. and Jon D. Ross and Aubrey B. Harwell, Jr., Neal & Harwell, Nashville, Tenn., for plaintiff-appellee.

Before WISDOM, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Calcasieu Television and Radio, Inc. and its sole shareholder and director, Russell Chambers, appeal the district court's award of attorneys' fees to NASCO based on Chambers's bad faith in conducting his defense to NASCO's breach of contract suit. 124 F.R.D. 120 (1985). We find that the district court has inherent power to prevent frustration of its judicial duty by a party. We also conclude that, although jurisdiction in this suit rested on diversity of citizenship, the district court may, without reference to Louisiana law, award attorneys' fees to the party forced by the obstructive tactics to incur them. A.J. Gray and Edwin McCabe appeal the district court's order disbarring them for various periods for their conduct of the defense. Richard Curry appeals the Court's order suspending him from practice. We hold that the district court afforded them due process and that

its findings are supported by clear and convincing evidence, and affirm the disbarment and suspension orders. In setting the length of McCabe's disbarment the district court considered that he is a resident of Massachusetts and would seldom have occasion to appear in the Western District of Louisiana. After the order was issued, however, the Massachusetts Bar ordered McCabe to show cause why it should not impose identical discipline. We do not know whether this turn of events may work an unintended result. In the interest of fairness, we remand to enable the district court to consider the length of McCabe's disbarment in light of this development.

I

On August 9, 1983, CTR and NASCO agreed to the sale to NASCO of CTR's television station. The agreement required CTR to file required forms with the FCC by a specified date, but it did not do so.

On Friday, October 14, 1983, NASCO notified Chambers that it would file suit in the district court seeking specific performance and would request a temporary restraining order preventing Chambers and CTR from encumbering property subject to the contract. Over the weekend, Chambers and his attorney, Gray, created a trust with Chambers's sister, Mabel Baker, as trustee. CTR then conveyed to the trust all of its immovable property subject to the contract of sale. On Monday morning, Chambers and Gray filed warranty deeds in the proper parish offices showing the transfer to the trust. NASCO filed its suit later that morning. At noon, the district judge conducted a telephone conference with NASCO's attorney and Gray regarding a temporary restraint of property transfers. Gray did not disclose in the conference that CTR was already transferring property to the trust.

On Monday afternoon, Chambers flew to Birmingham, where Baker signed the documents necessary to her appointment as trustee. She then signed a $1.4 million note on behalf of the trust for the purchase of the property.

On Tuesday, Gray informed the court of the transfers and that he had withheld the information during the telephone conference. NASCO amended its complaint to name Baker as a defendant and on October 24, the district court issued a preliminary injunction enjoining Chambers and CTR from encumbering the property, and an order restraining Baker from alienating or otherwise encumbering the property. On the next day, Baker nevertheless entered into a leaseback agreement with CTR.

In November 1983, NASCO sought access to CTR's general ledger and 1982 income tax return, but Chambers, through Gray, refused. The October 24 preliminary injunction ordered CTR and Chambers to grant NASCO access to any documents or records related to the assets purchased under the contract. The district court held these records were clearly within the scope of the injunction and fined Chambers and CTR after NASCO instituted a civil contempt proceeding. *NASCO, Inc. v. Calcasieu Television & Radio*, 583 F.Supp. 115 (W.D.La.1984). Chambers brought two unsuccessful appeals of this order, under § 1292(b) and § 1291. *See NASCO, Inc. v. Calcasieu Television & Radio*, slip op. No. 84–9037 (5th Cir. May 29, 1984); *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 752 F.2d 157 (5th Cir.1985).

The attorneys then filed four motions for summary judgment. Gray filed two on behalf of Chambers, Curry filed one on behalf of Baker, and Gray filed one on behalf of Chambers and Baker. In each motion, they argued that since the deeds of the station's property to the trust had been recorded before the NASCO–CTR contract, the public records doctrine barred specific enforcement of the contract. Before the hearing on the motions for summary judgment, NASCO filed an affidavit attacking Baker's credibility which Curry moved to strike; the court denied the motion. The district court then concluded that the transfer to the trust was a sham and denied summary judgment.

In August 1984, Gray moved for a protective order and for clarification of the scope of the October 24 preliminary injunc-

tion. After a hearing, the court denied that motion as well. Gray then filed on behalf of Chambers several compulsory counterclaims which proved to be baseless; indeed some had no relevance to the proceeding. For example, these claims included arguments that NASCO's conduct of its FCC ascertainment survey was improper, that NASCO would be unable to pay the purchase price, that NASCO had misrepresented its plans for the station, and that NASCO was not committed to the community interest. Chambers and Gray did not drop these claims until the eve of trial, when they admitted the contract was valid.

About the same time, Gray noticed the depositions of officials of Manufacturers Hanover, the financing bank for NASCO's purchase. McCabe, Chambers's Boston counsel, asserted that he took these depositions to determine NASCO's ability to pay the purchase price. Gray also took the depositions of five members of NASCO's board of directors, to determine whether the NASCO officer who had signed the purchase contract had been authorized to do so.

Throughout, Gray sought continuances, extensions of pleading deadlines, and deferments of scheduled discovery. After the district court finally set trial for February 27, 1985, Gray filed a motion to recuse the trial judge for bias and prejudice, which the trial court denied. Chambers and CTR sought a writ of mandamus from this court ordering recusal. Curry filed an "answer" to the petition on behalf of Baker, who was technically a respondent, in which he also urged that the writ be granted. This court denied the petition, calling it meritless. *In re Calcasieu Television & Radio, Inc. and G. Russell Chambers*, slip op. No. 85–4128 (5th Cir. February 25, 1985). The motion and the petition again delayed the trial. Chambers then listed 100 trial witnesses in the pretrial order. The case went to trial April 17–18, 1985 and only two of the 100 appeared to testify.

At trial, Chambers, CTR, and Baker argued only the public records doctrine defense. The district court rendered judgment on November 8, 1985, restoring the

status quo and ordering specific performance. *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 623 F.Supp. 1372 (W.D.La.1985). Chambers, Baker, and CTR appealed.

Soon after judgment, Chambers, without notice to NASCO, petitioned the FCC to construct a new transmission tower for the station and to relocate the station's transmission facilities. This change to a new site was not covered by the purchase contract, and would have materially altered the status quo in violation of the district court's judgment. The district court's informal intervention and NASCO's threat to seek further contempt sanctions persuaded Chambers to drop his petition.

On November 27, 1985, Chambers and Baker, through Gray and Curry, moved for a stay of the execution of the judgment pending appeal. The trial court denied the motion, and this court denied writs of mandamus sought by Chambers and by Curry on behalf of the trust. Chambers then petitioned Justice White to stay the judgment. Justice White denied the petition. *In re Calcasieu Television & Radio, Inc. and G. Russell Chambers v. NASCO, Inc.*, No. A–611 (White, J., in chambers, February 18, 1986) (unpublished opinion). Chambers and CTR fired Gray in March 1986 and Russell Tritico replaced him as their counsel of record. Tritico was later joined by McCabe.

In late spring 1986, while the appeal to this court from the judgment on the merits was still pending, a dispute arose between Chambers and NASCO over the station's equipment to be transferred under the contract. In the nearly three years since the agreement for the sale, several pieces of equipment listed in the contract had been taken out of service. NASCO contended that replacement equipment had to be conveyed, but Chambers refused. NASCO requested the court's aid in completing the sale. On the morning of the resulting hearing, McCabe filed a motion in opposition and a supporting memorandum, a request for jury trial on the motion, and a motion *in limine* to exclude evidence of assets not listed in the contract. The trial

court denied these motions, finding them to be frivolous. The court also warned McCabe, who was making his first full appearance in the case, that the defense had already engaged in bad faith, dilatory tactics and the court would tolerate no more.

During the hearing, from July 16–22, Chambers and CTR, at McCabe's direction, removed all of the disputed equipment from service at the station. McCabe now argues that this was to prove that the equipment was not necessary to the station's operations and thus not subject to the contract. Whatever the reason, removing the equipment, without any notice to the court or NASCO, directly violated the orders of the district court. The district court ordered Chambers and CTR to restore the equipment to service.

At the hearing, two CTR officials, called by McCabe, testified concerning the use and ownership of the disputed assets as part of an effort to prove CTR did not own them but rather leased them from another Chambers corporation, CAL–TV. McCabe introduced seventeen equipment leases as part of this effort. The trial court denied the motion, concluding that the leases were fraudulent and the testimony false. The trial court granted NASCO's motion.

On July 28, 1986, with NASCO's motion pending, McCabe sent a letter to NASCO's counsel stating Chambers intended to close the sale on August 4, 1986 and convey only the assets originally listed in the contract. This apparent effort to set up a termination of the sale by Chambers under the termination provisions of the contract failed. The trial court granted NASCO relief from the timing and termination provisions of the contract.

On August 6, 1986, this court affirmed the district court's judgment on the merits, imposed sanctions under Fed.R.App.P. 38 for a frivolous appeal, and remanded for a determination of the amount of these sanctions. The remand included an instruction to consider the applicability of Rule 11, Fed.R.Civ.P., and 28 U.S.C. § 1927 to Chambers, Baker, or their counsel for their conduct in the trial court. We did not

intend by this specific instruction to limit the district court's sanctioning power to that provided in the statute. *NASCO v. Calcasieu Television and Radio,* 797 F.2d 975 (5th Cir.1986).

On December 29, 1987, NASCO moved for sanctions against Chambers, Baker, McCabe, Gray, and Curry resting on section 1927, Rule 11, and the court's inherent power. The court held an evidentiary hearing on the motion on April 11, 1988. All of the parties filed briefs and submitted documentary evidence, affidavits, and testimony. On December 12, 1988, the court filed a minute entry soliciting additional arguments on the availability and propriety of non-monetary sanctions, namely suspension and disbarment of the attorneys. Each party except McCabe responded.

On January 23, 1989, the district court ordered Chambers to pay $66,286.65 in appellate sanctions and $996,644.65 in attorney's fees and related expenses, reprimanded Baker, disbarred Gray for three years, suspended Curry for six months, and declared McCabe ineligible to practice in the Western District of Louisiana for five years. The court did not rest a statute or rule, but found that it had the inherent power to issue the order. Louisiana and Massachusetts have ordered Gray and McCabe respectively to show cause why they should not impose identical discipline. Those orders have been stayed pending the outcome of this appeal.

## II

Chambers argues that the district court's award of attorneys' fees was not authorized by controlling Louisiana law. He contends that in a diversity case, a district court may not impose attorney's fees for bad faith litigation practices under its inherent power, but must look to state law. Louisiana allows attorneys' fees only when a contract or statute specifically provides for them. *Quealy v. Paine, Webber, Jackson, and Curtis, Inc.,* 475 So.2d 756 (La. 1985); *Huddleston v. Bossier Bank and Trust Co.,* 475 So.2d 1082 (La.1985). It does not recognize an exception for bad faith practice. It is undisputed that neither the contract nor any Louisiana statute here provides for attorneys' fees.

In *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Court noted that federal courts follow the "American Rule" that the prevailing party is not permitted to recover attorneys' fees, with a few exceptions, including an inherent power to impose attorneys' fees upon a losing party who has acted " 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' " 421 U.S. at 258–259, 95 S.Ct. at 1622 (quoting *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). This exception applies both when the bad faith occurs in the transaction giving rise to the suit and when a party litigates in bad faith. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980). A footnote, however, confuses the *Alyeska* ruling at least in diversity cases:

"[I]n an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed." Prior to the decision in *Erie R. Co. v. Tompkins,* 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188] (1938), this Court held that a state statute requiring an award of attorneys' fees should be applied in a case removed from the state courts to the federal courts: "[I]t is clear that it is the policy of the state to allow plaintiffs to recover an attorney's fee in certain cases, and it has made that policy effective by making the allowance of the fee mandatory on its courts in those cases. It would be at least anomalous if this policy could be thwarted and the right so plainly given destroyed by removal of the cause to the federal courts." ... We see nothing after *Erie* requiring a departure from this result. The same would clearly hold for a judicially created rule, although the question of the proper rule to govern awarding attorneys' fees in federal diver-

sity cases in the absence of state statutory authorization loses much of its practical significance in light of the fact that most States follow the restrictive American rule.

421 U.S. at 259, n. 31, 95 S.Ct. at 1622, n. 31 (citations omitted).

We are not persuaded that the Court intended to upset the view, nigh unchallenged in the history of the country, that federal courts have inherent power to police themselves by civil contempt, imposition of fines, the awarding of costs and the shifting of fees. Specifically, we are unpersuaded that the award of fees to a party injured by the opposing party's conducting a civil suit in a manner obstructive of justice necessarily implicates the substantive policy of states in diversity cases.

■ It is a given that federal courts enjoy a zone of implied power incident to their judicial duty. From the Judiciary Act of 1789 forward its functional necessity has not been seriously questioned. Rather, the task is one of defining its limits. As we see it, the dimensions of the zone are best grasped by taking both a horizontal and a vertical look. The immediate contention, that awarding fees implicates Louisiana's substantive policy, raises a question of vertical limits. But its answer requires the informing presence of horizontal limits; that is, the relationship between the source of the power and its particularization in rules governing sanctions such as Rule 11 and Rule 37, Fed.R.Civ.Proc., in rules governing contempt, and in statutes such as 28 U.S.C.A. § 1927. We turn first to the relationship between the courts' inherent power to prevent obstructive conduct and particular rules that respond to such conduct at various stages of the litigation process. We limit our discussion to the problem before us—whether Rule 11 and Section 1927 bar a district court from assessing fees against a party under its inherent power, when the party's conduct is not within the reach of the rule or the statute. We express no opinion whether, when the conduct is within the reach of either, the court may exceed these boundaries under the auspices of its inherent power.

It could be argued that the inferior federal courts may look only to rules of procedure and specific statutes providing remedies for obstructive conduct. The argument rests on the idea that Congress has the power to define the limits of the authority of inferior courts and that § 1927 and applicable rules adopted under the enabling acts reflect a congressional decision to confine the courts to the particular rules and statutes. After all, the argument goes, there is little point in defining procedures and remedies by particular rules if the courts retain a much broader "inherent power." We are not persuaded.

To the extent that inherent power is seen as a product of necessity, it contains its own limits. It is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function. It is power "*necessary* to the exercise of all others," *Roadway Express*, 447 U.S. at 764, 100 S.Ct. at 2464, 65 L.Ed.2d 488 (1980) (quoting *United States v. Hudson*, 11 U.S. (7 Cranch), 32, 34, 3 L.Ed. 259 (1812)) and "governed not by rule or statute but by the control *necessarily* vested in courts to manage their own affairs." *Link v. Wabash R. Co.*, 370 U.S. 626, 630, 82 S.Ct. 1386, 1389, 8 L.Ed.2d 734 (1962) (emphasis supplied).

Despite its linkage to necessity, it is not apparent that the inherent power is exhausted by rules addressing particular sets of problems, such as Rule 11. It is true that, to the extent conduct violates an explicit statute or rule, there is no necessity for resorting to power inherent in the judicial assignment. At the same time it does not necessarily follow that inherent power starts where rule or statute ends. Conduct may be of the genre addressed by the rule, such as an inadequate investigation preparatory to the filing of a complaint or bad faith prosecution of a claim, but outside its particulars such as the required signing under Rule 11 or conduct by a party rather than the lawyer under § 1927. Indeed, were the power at issue here reflected in a rule of procedure, much of our analysis would be unnecessary.

Accepting that Congress can limit the power, the question inevitably turns to the intended purpose of the rule. Yet, the scope of displacement intended by a rule is often uncertain. Indeed, it is likely to be uncertain unless the statute or rule explicitly describes its preemptive reach. This is so because adopting a rule of procedure such as Rule 37 is not necessarily inconsistent with simultaneously accepting a court's inherent power to shift fees for wanton and vexatious conduct. First, adopting a rule alters the analysis of judicial reach in diversity cases, at least since *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). For this reason alone, the inference that an *addition* of congressional authority to the inherent judicial power was intended by the promulgation of a rule is at least equally as compelling as the inference that adopting the rule was intended to supplant the court's inherent power.

Second, the positive heuristic values of particularizing conduct that could without the rule be dealt with by a court's exercise of inherent power also dispels the notion that adopting a rule necessarily infers an intent to displace inherent power.

Third, and finally, adopting particular rules supplements inherent power in another positive manner that is the essence of rulemaking. A rulemaker may sum experiences such as inadequate investigation preparatory to the filing of a pleading and condemn its practice despite the fact that singly the acts might not be so obstructive as to warrant ad hoc judicial responses. It follows that misconduct by parties as distinguished from their lawyers had not been found to be sufficiently widespread as to warrant a rule, that hardly compels the inference that when it does occur, the court lacks inherent power to deal with it because the subject was addressed by a rule and the rule omitted parties. Similarly, a rule maker may reach for practices in their bud, before they come to flower. Where a rule leaves off and the zone of inherent power picks up is not definable across the board—for all rules and statutes—and is often uncertain. That uncertainty is a reflection of uncertainty in the very idea of inherent power. At the very least it leads us to not venture beyond functional necessity at its source.

Given this uncertainty, it ought not be surprising, and it is the case that, viewed horizontally, inherent power is not a tidy doctrinal package. Two cases make the point. In *Link* the Court sustained a lower court finding of the inherent power of a district court to enter an involuntary order to dismiss a sua sponte case involuntarily. That Rule 41(b) dealt with involuntary dismissals and appeared to require a motion to dismiss did not trouble the Court. Justice Harlan observed that Rule 41 was not the source of the power to dismiss. Rather, the district court had exercised its inherent power. On the other hand, the Court in *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 22 L.Ed. 205 (1873), suggested that the rules for contempt, a specie of inherent power, were the sole source of district court authority to find contempt. That the district court could not have proceeded with contempt except by the rules for contempt does not necessarily mean, however, that it had no authority to otherwise remedy the conduct. So read, *Ex parte Robinson* and *Link* are not inconsistent. By this reconciliation, when a court is faced with bad conduct frustrating its ability to discharge its judicial duty, it is not confined to the process of criminal contempt, but may impose other sanctions in order to control the litigation before it.[1]

Our task here is not so large that we must quiet these uncertainties. Rather, it is sufficient that we explain our caution by describing concerns surrounding the inherent power of federal courts. Having said this, and despite the uncertainty of the inherent power's full reach, we are persuaded that the rules of civil procedure and § 1927 did not displace a district court's power to shift fees for bad faith wanton and vexatious conduct in the prosecution of

---

1. We need not grapple here with the preclusive effect of the Rule 42 Fed.R.Crim.P. and 18 U.S.C. § 401. This was not a criminal contempt proceeding and there is no suggestion that the full range of conduct could be remedied by civil contempt.

the case. We quickly take comfort from the reality that this much is implicit in *Alyeska*.

█ We turn now to the vertical view and our immediate issue—whether, as Chambers argues, the *Alyeska* Court read *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and its progeny as compelling district courts to look to state law in awarding attorney's fees for bad faith litigation practices in diversity cases. We are not persuaded that it did.

*Erie* broadly commanded federal diversity courts to apply state substantive law and federal procedural law. The current state of the *Erie* doctrine is reflected in *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) and *Hanna v. Plumer, supra*. In *Guaranty Trust Co.*, the Court held that, in diversity cases, *Erie* required issues significantly affecting the outcome of the litigation to be decided under state law. On the other hand, issues concerning the manner and means of enforcing the state-created substantive right in federal court were to be determined by federal law. 326 U.S. at 109, 65 S.Ct. at 1469. In *Hanna*, the Court refined this analysis after conceding that every procedural issue could be outcome-determinative in the proper context. The Court stated that when, as here, no federal rule controls and *Erie* analysis is therefore necessary, the outcome-determination test "cannot be read without reference to the twin aims of the *Erie* rule—discouragement of forum shopping and avoidance of inequitable administration of the laws." 380 U.S. at 468, 85 S.Ct. at 1142.

Predictably, the circuits have not been even in their treatment of the issue. In *Tryforos v. Icarian Development Co., S.A.*, 518 F.2d 1258 (7th Cir.1975), *cert. denied, Manta v. Tryforos*, 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976), the court considered a fee award in a shareholder's derivative action under state law for misappropriation. The plaintiff shareholders changed attorneys frequently during the litigation and otherwise sought to avoid a trial on the merits in the district court, apparently preferring some other forum. Finally, they sold their stock and, despite some objections from another shareholder, the district court dismissed the action with prejudice for failure to prosecute. The district court retained jurisdiction to award defendants $92,500 in attorneys' fees. The Seventh Circuit reversed. The court rejected the defendants' assertion that federal law governed the award, concluding that the *Alyeska* footnote required it to apply Illinois law. 518 F.2d at 1265, n. 27. The court concluded that the Illinois statute allowing fees in that circumstance did not cover the plaintiff's conduct. *Id.* at 1266.

In *Lewis v. S.L. & E., Inc.*, 629 F.2d 764 (2d Cir.1980), the court reversed a judgment on the merits in favor of the defendants in a shareholder's derivative action. The court also reversed the attorneys' fee award, saying that it could not find a New York statute that allowed the defendants to recover their fees in this kind of derivative action; and if the district court made the award because it thought the plaintiffs brought the action in bad faith, the reversal on the merits removed that basis for the award. 629 F.2d at 773. In a footnote, the court stated "In this diversity action, state law governs the question of attorneys' fees," citing the *Alyeska* footnote. *Id.*, n. 21.

In *LaRouche v. National Broadcasting Co.*, 780 F.2d 1134 (4th Cir.), *cert. denied*, 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986), the plaintiff sued NBC, the Anti–Defamation League of B'Nai B'Rith, and others in a diversity action alleging defamation. He lost, and the Anti–Defamation League moved for sanctions in the form of attorneys' fees against plaintiff and his attorneys under Rule 11, § 1927, and the district court's inherent power to cope with bad faith litigation. The district court denied the motion and the Fourth Circuit affirmed, finding no abuse of discretion. The court apparently assumed the district court could have imposed sanctions under its inherent power. *See* 780 F.2d at 1140.

In *Montgomery Ward v. Pacific Indemnity Co.*, 557 F.2d 51 (3d Cir.1977), the defendant insurer Pacific refused to defend Montgomery Ward in a products liability action. Montgomery Ward sought a declaratory judgment that Pacific was required to defend or indemnify and to recover attorneys' fees for both the products liability action and the declaratory judgment action. The products liability action was settled and Pacific indemnified Montgomery Ward and paid its counsel fees for that action. Montgomery Ward continued to prosecute the declaratory judgment action to recover its fees for that action. The district court awarded the fees for what it found to be Pacific's bad faith, based on its own inherent power rather than any authority derived from state law. The Third Circuit affirmed the award because it was valid under state law, but noted the district court's use of its inherent power was improper in that state law governs attorneys' fees awards in diversity cases. 557 F.2d at 56–58. Judge Gibbons concurred in the judgment, but did not agree that federal courts were *Erie*-bound to apply state law when the bad faith amounted to an abuse of process:

> I do not agree, however, that in a state which would not [recognize the bad faith exception], a federal forum would be precluded from awarding attorneys' fees for what amounts to a vexatious abuse of its process. I regard the award of attorneys' fees [here] as more in the nature of costs than are such awards under the other exceptions to the American Rule. Certainly the notions of federalism which underlie the *Erie* rule do not require that a federal forum accept the public policy of the state in which it happens to sit on a matter such as the award of costs for abuse of its process.

557 F.2d at 61.

Judge Gibbons viewed Pacific's refusal to defend or indemnify, and its defense of that position in the declaratory judgment action, as an abuse. The district court took the same approach in *Republic of Cape Verde v. A. & A. Partners*, 89 F.R.D. 14, 20 n. 12 (S.D.N.Y.1980).

Judge Gibbons did not distinguish between two aspects of the bad faith exception. As we see it, bad faith in an underlying transaction and bad faith in the prosecution of a claim present quite different problems. That is not to say that conduct in prosecuting a claim is inevitably a nonsubstantive matter. Federal judgments about whether a contention is substantial or frivolous can quickly implicate state choices of policy. The "procedural" trace of state policy in a federal decision is evident in the use by states of private attorneys general to enforce state standards. A state may set a low threshold to encourage such policing. A finding of bad faith prosecution as a predicate for fee-shifting when it rests on the substantiality of the contention is intertwined with state choices among means of enforcing standards for corporate conduct. *Tryforos* and *Lewis, supra*, (shareholder derivative actions) may be explained in these terms. In sum, the dichotomy of underlying transaction versus trial does not evenly separate substance from procedure and we do not suggest that it does. This is also the rationale of this circuit. *Perkins State Bank v. Connolly*, 632 F.2d 1306 (5th Cir.1980) is not contrary. It bears emphasis that the question before the panel in *Perkins* was whether bad faith in the commercial transaction giving rise to the suit triggered fee-shifting. Fee-shifting is in that circumstance a substantive policy choice by the state. The panel properly looked to Florida law for the answer.

■ In this case, however, the award was based on Chambers's bad faith in the manner of conducting the litigation; it did not rest on a federal measuring of the merit in Chambers's defense. We do not see how the district court's inherent power to tax fees for that conduct can be made subservient to any state policy without transgressing the boundaries set out in *Erie, Guaranty Trust Co.,* and *Hanna.* Fee-shifting here is not a matter of substantive remedy, but of vindicating judicial authority. Of course, use of inherent power is outcome determinative in the sense that Chambers owes fees he would not have owed had Louisiana law applied; but that is not the question after *Hanna. Erie*

does not compel a federal court to tolerate abuses in diversity cases that the court would not tolerate in other cases; nor does it limit the range of measures at the court's disposal to vindicate its authority. It is not the business of the state and federal courts to run the other's courtroom.

Courts have approved other uses of the inherent power to control the litigation in diversity cases. In *Link v. Wabash R. Co., supra,* for example, there is no discussion of the effect of state law on the court's power to dismiss that diversity suit. *Williams v. New Orleans Public Service, Inc.,* 728 F.2d 730 (5th Cir.1984). We approved the exercise of the inherent power in a diversity case to declare parties absent from docket call ready for trial, again without discussion of state law. In *Jochum v. Schmidt,* 570 F.2d 1229 (5th Cir.1978), a diversity case, we affirmed the district court's exercise of its inherent power to condition a voluntary nonsuit on the payment of costs, including attorneys' fees.

In *Sibaja v. Dow Chemical Co.,* 757 F.2d 1215 (11th Cir.), *rehearing denied* 765 F.2d 154, cert. denied 474 U.S. 948, 106 S.Ct. 347, 88 L.Ed.2d 294 (1985), the court held that federal forum non conveniens doctrine applied in diversity actions, in the face of an *Erie* challenge. A dismissal under that doctrine is an exercise of the court's inherent power. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

The point is that the exercise of the federal inherent power in these cases, as in this one, in an effort to control the litigation does not foster the forum shopping and inequitable administration of the laws *Erie* was designed to prevent. *Erie* guarantees a litigant that if he takes his state law cause of action to federal court, and abides by the rules of that court, the result in his case will be the same as if he had brought it in state court. It does not allow him to waste the court's time and resources with cantankerous conduct, even in the unlikely event a state court would allow him to do so.

### III

█ Chambers contends there was insufficient evidence to support the district court's conclusion that he litigated in bad faith. We disagree. He was the central figure in the creation of the trust, the sham transfer of the station's assets to it, and the almost immediate leaseback. While some of this conduct arguably occurred before the lower court acquired jurisdiction, it continued thereafter. In arguing the baseless recusal motion, Gray indicated he had filed it at Chambers's insistence. Chambers's petition to the F.C.C. to build a new transmission tower was in direct violation of the district court's order.

There was also evidence to support the district court's conclusion that Chambers was heavily involved in the fraudulent leases and false testimony presented at the hearing on the motion for judicial assistance. The corporation that allegedly owned the disputed equipment had no employees and had never engaged in production activities. The leases were rather obviously backdated—for instance, Chambers's wife signed one of them in her married name, but it was dated before their marriage.

Even making the dubious assumption that Chambers had nothing to do with the other litigation tactics the attorneys undertook, this evidence sufficiently supports a finding of bad faith. The district court did not err.

Finally, Chambers contends the amount of the sanctions was an abuse of discretion. We disagree. NASCO's expenses throughout this litigation were without exception the product of Chambers's bad faith tactics. The award reflects the amount of these expenses.

### IV

Gray, McCabe, and Curry argue that the disbarment and suspension proceedings violated due process. They say they did not have adequate notice that the court was considering disbarment; they assert that they participated in the sanctions hearing under the impression that they were defending only

against monetary sanctions and did not know until the minute entry of December 12 that they also faced disbarment or suspension. Gray and Curry contend they were not given adequate notice of the conduct for which they faced disbarment or suspension. Finally, Gray argues the April 11 hearing was inadequate for disbarment purposes because it was limited to one day and it was prosecuted by NASCO's attorneys.

### A

■ The appellants rely primarily on *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), to support their claim that the notice of their potential disbarment or suspension in the minute entry was inadequate. Ruffalo had been disbarred by the Supreme Court of Ohio on two charges relating to his alleged solicitation of clients for FELA cases. One charge had originally been presented to the state Board of Commissioners on Grievances and Discipline; the board added the other during the hearing, after Ruffalo had presented his defense. The Sixth Circuit then disbarred him based solely on the charge the board added during the hearing. The Court held the Sixth Circuit erred because Ruffalo had not been given adequate notice of this charge or an opportunity to defend it. 390 U.S. at 550–551, 88 S.Ct. at 1225–1226.

Here, Gray, McCabe, and Curry were informed of the charges for which they were subject to sanctions when NASCO filed its motion for sanctions on December 28, 1987. They presented their defenses to the charges at the hearing on monetary sanctions on April 11, 1988. They were later informed that the court was considering disbarment or suspension for the same offenses and were allowed to file briefs on that question.

We hold the appellants were afforded due process. They had adequate notice of the charges and were allowed to present a defense to each one of them at the hearing. The only question they were not allowed to argue at the hearing was whether their conduct subjected them to disbarment or suspension. The district court remedied that by allowing them to file briefs devoted to the issue after the minute entry. We see no defect in these proceedings.

### B

■ Gray and Curry claim that NASCO's motion did not adequately inform them of the charges, but merely made vague and general allegations of misconduct over the course of the litigation by all of its opponents. We disagree. NASCO's motion contained four pages of allegations of specific instances of misconduct. Gray or Curry or both were alleged to be responsible for many of the acts listed.

### C

■■ Finally, Gray's argument that the hearing was inadequate also fails. First, we see no indication that he was in any way prejudiced because the hearing lasted only one day. Since the misconduct alleged occurred in the court, there was no need for elaborate proof of the facts, and the parties offered none. Gray was given an opportunity to call any witnesses he wished and to take the stand himself. He chose not to. Second, we are not persuaded that NASCO's "prosecution" of the sanctions proceeding violated the strictures of *Young v. United States*, 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). There the Court held the appointment of the opposing counsel in the underlying litigation to prosecute a criminal contempt proceeding violated due process. The Court reasoned that counsel could not adequately represent the interests of the government and the interests of his private client at the same time. 107 S.Ct. at 2135–2139. Gray argues that because we have characterized a disbarment proceeding as quasi-criminal, *In re Thalheim*, 853 F.2d 383, 388 (5th Cir.1988), the reasoning in *Young* should apply.

We are unable to find any authority to support Gray's contentions and he points us to none. Further, we conclude that the danger present in *Young*, that private counsel would be overzealous in the contempt proceedings in an effort to further the interest of his client, was not present here. The arguments of counsel at the

**708**

hearing were devoted entirely to the issue of monetary sanctions. The court later relied on its own research, aided by any briefs the parties wished to file, in determining the propriety of nonmonetary sanctions. 124 F.R.D. at 137, n. 10. The court thus avoided placing NASCO's counsel in the role of prosecutor for the disbarment proceedings.

V

 Gray, McCabe, and Curry next argue that the evidence was insufficient to support their respective disbarments and suspension. The district court could have disbarred them only on the strength of clear and convincing evidence that they committed a disbarment offense. *Thalheim,* 853 F.2d at 389, n. 9. We hold there was sufficient evidence to disbar.

There is no dispute that the appellants did everything the district court said they did. The district court found that they did it in bad faith, for the purpose of delaying an inevitable judgment against their clients. We have examined the record, and have concluded that clear and convincing evidence supported that finding. All three men repeatedly urged the frivolous public records doctrine defense. McCabe displayed disregard for the authority of the court by removing the disputed equipment from service at the station. McCabe also introduced fraudulent leases and testimony, characterized by the district court as "perjury." Gray and Curry made baseless arguments for recusal of the district judge. Gray noticed numerous needless depositions. Every act they undertook was to further the fraud on NASCO and on the court begun by the sham transfer to the trust. Their protestations that they acted in a good faith effort to defend their clients are not sufficient to overturn their disbarments and suspension in the face of this evidence.

VI

 Finally, McCabe argues the district court abused its discretion by disbarring him for five years. He cites *Thalheim* to support his contention that his conduct did not render him morally unfit to practice

law, and he should not have been disbarred, or at least not for that long.

We note that the district court, in denying all motions for new trial on the sanctions issue, stated "McCabe's sanction was affected by the fact that he is a non-resident of the State of Louisiana, is not a member of the bar of this court; and by the probability that he rarely appears before this court." R. 3762. We are concerned that the district court may not have anticipated that the Massachusetts Bar would similarly discipline McCabe. Therefore, without expressing an opinion on the propriety of a five year period of disbarment on the facts of this case, we remand to allow the district court to further consider the length of McCabe's disbarment in light of any action, or contemplated action, by the Massachusetts Bar.

AFFIRMED and REMANDED.