In the Matter of Edwin A. McCabe.

Suffolk. October 7, 1991. - December 23, 1991.

Present: Liacos, C.J., Wilkins, Lynch, O'Connor, & Greaney, JJ.

*Attorney at Law*, Reciprocal discipline.

The record of a disciplinary proceeding before the United States District
Court for the Western District of Louisiana in which a member of the
Massachusetts Bar was found guilty of misconduct and declared ineligi-
ble to practice in the Western District of Louisiana for a period of five
years was insufficient to provide a basis for reciprocal discipline against
the attorney pursuant to S.J.C. Rule 4:01, § 16. [441-450]

Information filed in the Supreme Judicial Court for the
county of Suffolk on February 13, 1989.

The case was reported by *Greaney*, J.

*Terence M. Troyer*, Assistant Bar Counsel.

*Edwin A. McCabe & Richard W. Renehan (Martha M.
Born* with them) for the respondent.

Lynch, J. In this case, here on a reservation and report by
a single justice, we are asked to decide whether an attorney,
Edwin A. McCabe (Mr. McCabe), should receive reciprocal
discipline pursuant to S.J.C. Rule 4:01, § 16, as amended,
402 Mass. 1302 (1988). The United States District Court for
the Western District of Louisiana found Mr. McCabe guilty
of misconduct and declared him ineligible to practice in the
Western District of Louisiana for a period of five years.
*NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 124
F.R.D. 120, 146 (W.D. La. 1989). The Fifth Circuit Court
of Appeals affirmed but remanded for reconsideration of the
length of the sanction. *NASCO, Inc.* v. *Calcasieu Television
& Radio, Inc.*, 894 F.2d 696, 708 (5th Cir. 1990), aff'd sub
nom. *Chambers* v. *NASCO, Inc.*, 111 S. Ct. 2123 (1991)
(The United States Supreme Court decision noted, but did

not review, sanctions imposed on Mr. McCabe and other members of the bar. That decision was concerned only with the sanctions imposed on G. Russell Chambers). On reconsideration, the District Court imposed the same sanction.

The underlying action involved the enforcement of a purchase and sale agreement and subsequent attempts to evade specific performance by Chambers, Calcasieu Television and Radio, Inc. (CTR) (collectively, clients), and Calcasieu TV and Radio, Inc. (CAL-TV). While we are concerned here only with Mr. McCabe's conduct, an overview of the prior litigation is necessary. For an expanded recitation of the history of the litigation, see *Chambers* v. *NASCO, Inc.*, 111 S. Ct. at 2128-2130, from which the following synopsis is taken.

1. *Facts.*

A. *History prior to Mr. McCabe's appearance.*

On August 9, 1983, clients entered into an agreement with NASCO, Inc., for the purchase and sale of a television station (KPLC-TV), which they failed to perform. On Friday, October 14, 1983, NASCO told clients that NASCO was filing suit the following Monday, seeking specific performance and a temporary restraining order (TRO). Clients and their attorney at that time, A. J. Gray, III, then set up a sham sale of the properties at issue. Mr. Gray participated in a conference on Monday, October 17, 1983, with the Federal District Court judge, without disclosing the purported sale despite the judge's queries concerning a possible sale to third parties. The judge issued a TRO and informed Mr. Gray of its contents over the telephone. The next morning Mr. Gray informed the judge by letter of the recordation of the sham sale and that his failure to disclose that information earlier was intentional.

Subsequently, the judge granted a preliminary injunction and a second TRO to prevent any further sale of the properties at issue. The judge warned that Mr. Gray's and Chambers' conduct had been unethical. Thereafter, clients' refusal to allow inspection of corporate records, in defiance of the preliminary injunction, resulted in contempt proceedings.

Clients also proceeded with "a series of meritless motions and pleadings and delaying actions," including deposing bankers to learn whether NASCO could afford to pay for the station.[1]

On the eve of trial, clients stipulated that the purchase agreement was enforceable and that Chambers had breached the agreement. The only defense presented at trial was the public records doctrine.[2] Before the judge rendered his opinion and judgment, clients took various steps to subvert the purchase agreement which NASCO was able to avert only by seeking contempt sanctions. Once judgment was rendered, clients filed numerous appeals and motions to stay judgment pending appeal. When these were denied, CTR officials filed formal oppositions to NASCO's pending Federal Communications Commission application. Again, NASCO sought contempt sanctions, and all opposition was withdrawn.

On June 24, 1986, the parties attended a meeting in Atlanta, Georgia, ostensibly moving toward closing the sale. One of the issues which came up at the meeting concerned a disagreement over which equipment was to be transferred with the station. Because of this and other disagreements, NASCO moved for judicial assistance on July 1, 1986. A hearing was scheduled for July 16, 1986.

B. *Mr. McCabe's actions.*

The record shows that Mr. McCabe was hired by clients in early summer 1986 to represent them at the July 16, 1986,

---

[1] A. J. Gray, III, attorney for clients, noticed a long series of depositions. Two of the depositions were of bankers located in New York. Mr. Gray asked Mr. McCabe to take these depositions. Subsequently, the judge acting sua sponte called a status conference in 1984 to find out why bankers were being deposed and cancelled the remaining depositions consistent with his authority under Fed. R. Civ. P. 26(g). *Chambers* v. *NASCO, Inc.*, 111 S. Ct. 2123, 2129 (1991).

[2] Under Louisiana law, "no notice other than registry may prove knowledge." *Bergeron* v. *Louisiana Land & Exploration Co.*, 95 F.2d 47 (1938). Clients argued, therefore, that, because NASCO failed to record the purchase agreement, the subsequent "sale" by clients to the trust they created was legal and enforceable. Clients recorded their "sale" to the trust on Monday, October 17, 1983, at 8:30 A.M., before the temporary restraining order hearing was held.

hearing. On July 15, 1986, Mr. McCabe filed two motions.[3] On the morning of July 16, 1986, he filed a pleading opposing the motion for judicial assistance.[4] Later that day, he was admitted pro hac vice to the United States District Court for the Western District of Louisiana and participated in the hearing.[5]

On July 18, 1986, at Mr. McCabe's suggestion, clients unplugged certain equipment from service, but did not remove it from the premises.[6] On July 28, 1986, Mr. McCabe's firm sent a letter to NASCO stating CTR was prepared to close on August 4, 1986, strictly in accordance with the agreement.[7]

On August 5, 1986, Mr. McCabe filed a motion for relief from judgment and two appeals.[8] On August 6, 1986, the appellate court affirmed the November 27, 1985, judgment in a per curiam opinion. Mr. McCabe terminated his represen-

---

[3]Judge Scott did not allow the motion in limine to exclude parol evidence and the motion for reinstatement of jury demand to be filed because they did not comport with local rules.

[4]The pleading was broken down into six sections addressing each of NASCO's requests for relief in the order presented in NASCO's motion.

[5]Prior to these dates, Mr. McCabe had been involved in this case only peripherally when he took depositions in New York in 1984, as an accommodation to Mr. Gray, the attorney then handling the case. (See note 1, *supra*.)

[6]Mr. McCabe said this was done in order to show that the equipment in issue was not "necessary" to the operation of the station, as NASCO was arguing.

[7]It further stated: "If the United States District Court for the Western District of Louisiana Court [*sic*] issues further orders that modify or expand our clients' obligations under the Purchase Agreement and such orders become final, [CTR] will take such steps as are necessary to comply with those orders."

[8]The basis of the motion for relief from the judgment dated November 27, 1985, as characterized by the District Court judge, was the termination provisions of the purchase agreement. *NASCO, Inc. v. Calcasieu Television & Radio, Inc.,* 124 F.R.D. 120, 130 (W.D. La. 1989).

One appeal was from an order that all equipment removed from service on July 18, 1986, be restored to service. The other appeal was from an order granting NASCO's motion seeking relief from the timing and termination provisions of paragraph 16 of the purchase agreement.

tation and immediately withdrew the motion for relief and both notices of appeal.[9]

C. *The hearing.*

At the July hearing NASCO claimed certain equipment, including equipment subject to leases, was replacement equipment used directly in the operation of the station. Therefore, they claimed, such equipment should be transferred to them for the original purchase price. They had conducted an inventory in October, 1983, and updated it in April, 1986. They claimed that certain pieces of equipment which were used in the operation of the station were not listed on Exhibit B. They wanted to use their updated inventory to close the sale.

Clients claimed that *only* equipment listed on Exhibit B, or items they deemed replaced Exhibit B items, were part of the original purchase. Any other equipment in the station had no bearing on the original purchase and sale. Thus, it was not transferable to NASCO — or at least not for the original purchase price.

As a secondary matter, clients argued that certain of the equipment claimed by NASCO as replacement or "necessary" equipment was purchased after the 1983 agreement had been signed, and was owned by CAL-TV, a wholly-owned subsidiary of CTR.

2. *Supreme Judicial Court Rule 4:01, § 16.*

Supreme Judicial Court Rule 4:01, § 16 (5), as amended, 402 Mass. 1302 (1988), states: "A final adjudication in another jurisdiction that an attorney has been guilty of misconduct *may* be treated as establishing the misconduct for purposes of a disciplinary proceeding in the Commonwealth" (emphasis added). Given the permissive language emphasized above, we will examine the record below to determine whether Mr. McCabe should receive reciprocal discipline.[10]

---

[9]*NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 124 F.R.D. 120, 145 (W.D. La. 1989).

[10]This is not a case where the attorney should be precluded by Federal Court decisions from raising the issue of the appropriateness of sanctions. The question being litigated in the two jurisdictions is very different. Limi-

3. *Sanctionable Acts.*

A. *"Removal" of equipment from service.*

In its sanctioning opinion dated January 23, 1989, the District Court judge found as follows:

> "During a three day recess after the 16th [of July], all of the equipment at issue in the hearing was removed and taken off line and the worn-out or outmoded equipment described in the 1983 Purchase Agreement was placed in operation. This was done on the admitted advice of McCabe without the consent of the Court or opposing counsel and, indeed without informing either of them. We deemed this to be an act of arrogance, in direct violation of the warning by the Court, and we ordered the immediate reinstallation of the equipment which had been removed." *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 124 F.R.D. 120, 145 (W.D. La. 1989).

The equipment at issue was not removed from the premises, but rather unplugged and "removed from service" on Friday, July 18, 1986. The judge learned of this on Monday morning, July 21, when the hearings resumed. The judge commented on this action only at the end of the hearing, in the afternoon of July 22, 1986.[11]

___

tations on pro hac vice appearances ought not apply automatically to an attorney's right to practice in his home State. Rule 4:01, § 16, clearly preserves our discretion to examine the record from another jurisdiction in circumstances we deem appropriate. This is the rule even in States where their disciplinary rule appears more restrictive than ours. See *In re Solerwitz*, 575 A.2d 287 (D.C. App. 1990); *In re Reiner*, 561 A.2d 479 (D.C. App. 1989); *The Florida Bar* v. *Wilkes*, 179 So. 2d 193 (Fla. 1965); *Office of Dist. Counsel* v. *Smith*, 780 P.2d 87 (Hawaii 1989); *Kentucky Bar Ass'n* v. *Signer*, 533 S.W.2d 534 (Ky. 1976); *Nebraska State Bar Ass'n* v. *Dineen*, 235 Neb. 363 (1990). Furthermore, in order for us to decide how an attorney's out-of-State conduct affects his right to practice here, that conduct must be subjected to some degree of scrutiny.

[11]"Under the circumstances, I am not saying anything about the character of what was done here or why it was done in an attempt not to get back into such subjects as I have had my fill in this lawsuit. . . . In order to return status quo and to keep this case in line to be tried as it should be

The record does not disclose a specific "warning" of which Mr. McCabe's action was "in direct violation." When the judge was summarizing the history of the litigation on the morning of July 16, 1986, he mentioned unacceptable behavior by prior defense counsel. He stated:

> "[I]t was not up to defense counsel to interpret [orders] independently, that it was incumbent upon defense counsel to have the matter thrashed out in court and determine what was and was not allowed at the hearing before the Court, not by the unilateral action of defendant and his attorneys."

This comment was part of a long soliloquy by the court prior to the allowance of local counsel's motion for admittance of Mr. McCabe, pro hac vice. Perhaps this is the warning to which the judge was referring.

The language of his August 7, 1986, opinion, in regard to the July hearing, is ambiguous and confusing. On the one hand, he deems removal of the equipment to be calculated and deliberate.[12] On the other hand, he drops a footnote that "[t]here is nothing wrong with that purpose," given Mr. McCabe's explanation of why the equipment was removed.[13]

---

tried, I hereby order that all the changes that were made . . . after Wednesday . . . of last week be restored and the . . . equipment be reinstalled and placed in exactly the same position that it was prior to that time."

[12]"[S]ome of [clients'] attorneys in this proceeding have not hesitated to use any devious and underhanded tactic available to defeat the performance of this contract. The latest of these occurred when CTR, on the advice of Mr. Edwin McCabe, its attorney at this hearing, and while this hearing was in progress, removed a substantial number of disputed items of equipment from use by KPLC-TV, knowing that plaintiff's claim is predicated on the theory that those items were being used and would continue to be used until date of closing as replacements for other operating equipment. *This move was calculated and deliberate and was done slyly and surreptitiously without notice to opposing counsel or to this Court*" (emphasis added). *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, No. 86-4003, slip op. at 39 (W.D. La. August 7, 1986).

[13]"Plaintiffs discovered this action and reported it to the Court sometimes [*sic*] after hearing was resumed on July 21 and July 22. Mr. Mc-

When the Fifth Circuit reviewed the matter on appeal, it characterized the removal of equipment as follows:

"During the hearing, from July 16-22, Chambers and CTR, at McCabe's direction, removed all of the disputed equipment from service at the station. McCabe *now* argues that this was to prove that the equipment was not necessary to the station's operations and thus not subject to the contract. Whatever the reason, removing the equipment, without any notice to the court or NASCO, *directly violated the orders* of the district court . . . ." (Emphasis added.) *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.* 894 F.2d 696, 700 (5th Cir. 1990).

This characterization appears dubious in two respects.[14] First, Mr. McCabe *always* argued that the reason the equipment was unplugged was to show that the equipment was not necessary to the station's operations. Second, it is not clear

---

Cabe's explanation to the Court was that the defendants wanted to demonstrate that KPLC-TV could be operated with the original equipment and would still receive public acceptance when so operated. *There is nothing wrong with that purpose.* As any experienced attorney or a judge is aware, Mr. McCabe would have achieved much more credibility if he had given notice to opposing counsel and the Court. It is particularly true in this case when the Court, at the beginning of this hearing on July 16, 1986 and in open court, discussed with Mr. McCabe, as new counsel, the type of tactics which have been utilized in this case in the past. Our patience has been taxed too long." (Emphasis added.) *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, No. 86-4003, slip op. at 39.

[14]The Fifth Circuit's opinion is also troublesome where it states that

"There is no dispute that the appellants did everything the district court said they did. The district court found that they did it in bad faith, for the purpose of delaying an inevitable judgment against their clients. We have examined the record, and have concluded that clear and convincing evidence supported that finding. All three men [referring to Mr. McCabe among others] repeatedly urged the frivolous public records doctrine defense." *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 708 (5th Cir. 1990).

As bar counsel conceded at oral argument, there is no evidence in the record that Mr. McCabe ever urged the "frivolous public records doctrine defense."

what orders the court determined were violated by Mr. Mc-
Cabe. The record indicates that the preliminary injunction of
October 31, 1983, and the judgment of November 27, 1985,
were the only orders outstanding.

The preliminary injunction enjoined Mabel Christine
Baker, trustee for the Facility Trust, and others, from selling,
transferring, conveying, assigning, or in any way encumber-
ing, property conveyed to her by clients on October 16, 1983.
The equipment Mr. McCabe ordered disconnected was pur-
chased subsequent to this date. In addition, the act of un-
plugging the equipment would not appear to fall within the
ban of "selling, transferring, conveying, assigning, or in any
way encumbering" it.

The judgment of November 27, 1985, is ambiguous. It or-
dered the clients to "perform any and all . . . acts which may
be necessary to restore the parties to the *status quo ante li-
tem* . . . ."[15]

Mr. McCabe had his clients unplug any equipment not
listed on Exhibit B of the 1983 purchase agreement. Taken
literally, this action could be construed as *restoring* the sta-
tus quo ante litem — i.e., restoring the station to its operat-
ing status as it was in 1983. If so construed, Mr. McCabe's
actions could not be considered as violating the November,
1985, judgment.

The judgment, however, further enjoins "any . . . acts in
furtherance of the . . . substitution or other alteration of *ex-*

---

[15] It further permanently enjoined the clients and their attorneys:

"(a) From selling, transferring, conveying, assigning, encumbering,
wasting, or destroying any of the assets being purchased by the
plaintiff, NASCO, Inc., pursuant to the terms of the August 9, 1983
Purchase Agreement and its attached exhibits and schedules;

. . .

"(c) From any act or acts in furtherance of the construction of new
facilities and/or the relocation, substitution, or other alteration of
existing facilities, except as may be required for the preservation
and maintenance of purchased assets or otherwise for the fulfillment
of the obligations assumed by the defendants pursuant to the August
9, 1983 Purchase Agreement."

*isting* facilities" (emphasis added). The italicized language could fairly be interpreted as mandating that the facilities, as they existed on the date of the judgment, should not be disturbed.

The injunction goes on to say "except as may be required for the preservation and maintenance of *purchased* assets" (emphasis added). One plausible construction of this language would be that the purchased assets are those listed on Exhibit B. If so, plugging in such equipment would not disturb the status quo.

Until the judge determined that the equipment which was unplugged was "replacement equipment," and that Exhibit B, when originally written, was incomplete (as he did in his unpublished August 7, 1986, opinion), it was not clear that Mr. McCabe's actions were prohibited.

Of course, Mr. McCabe could have foreclosed any dispute about the matter by informing the judge and opposing counsel of his plans prior to or contemporaneously with such actions. In view of the protracted history of the case and clients' attempts to frustrate the orderly progress of the litigation, his unilateral actions were sure to anger the judge.

During the status conference preceding the hearing on July 16, and once during the hearing, on July 21, the judge had made numerous references to the unethical behavior, delay, and harassment techniques previously experienced. Mr. McCabe frequently pointed out that he was not part of the case when these actions took place. The judge was at pains to indicate he did not hold Mr. McCabe responsible for past acts.

Mr. McCabe entered the case, therefore, on notice that the judge regarded prior counsel's dilatory tactics as rising to the level of unethical behavior, and, as a consequence, that there be no further unilateral interpretation of the judge's orders. By not informing the judge and opposing counsel of his contemplated actions, therefore, Mr. McCabe was at least guilty of poor judgment. Even if we assume that his actions can be considered a violation of the judge's order,

however, we do not think his transgressions require his suspension in this Commonwealth.

B. *Fraudulent leases.*

Mr. McCabe was also sanctioned for introducing in evidence certain fraudulent leases. *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 708 (5th Cir. 1990). There is no question that an attorney, who would alter documents prior to their introduction in court or use such documents knowing that they had been so altered, would be guilty of serious misconduct requiring a much greater sanction than even that recommended by bar counsel in this case. It does not appear, however, that the record warrants the conclusion that Mr. McCabe knew of, or participated in, the alteration of those documents.

NASCO itself had entered in evidence copies of the leases supplied to it by clients.[16] On July 16, 1986, and again on July 21, 1986, NASCO called the president of CTR to the stand and questioned her at length on the leases. During the course of the second day of her examination, NASCO requested the original leases be delivered to the court because certain invoices were missing from the copies. After much discussion, the lawyers arranged to have the original leases produced for the court.

These documents arrived in the afternoon of July 21, 1986. NASCO questioned another CTR officer about the leases, then showed him the originals. Later, on July 22, 1986, when Mr. McCabe was examining a witness on the subject, NASCO requested that the leases be placed in the record. At the end of the examination Mr. McCabe complied with this request.

---

[16]Stephen Rider, an attorney in Mr. McCabe's office, had requested that defendants prepare copies of the leases to satisfy the subpoena. No one in Mr. McCabe's office saw the original leases until they were delivered to court on the afternoon of July 21, 1986.

While the judge's finding that the leases were "nothing more than instruments of deception" was warranted,[17] *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 124 F.R.D. at 130, no evidence in the record indicates Mr. McCabe knew or should have known that they were fraudulent. Indeed, an attorney who had represented clients from the inception of the purchase and sale explained this leasing arrangement to the judge in the status conference prior to the July 16, 1986, hearing. In addition, the original leases were not prepared by Mr. McCabe or his firm and were not seen by them until the afternoon of July 21, 1986. Furthermore Mr. McCabe's main argument at the July, 1986, hearing did not rely on the leases at all, but rather on the original contract and Exhibit B.

C. *Perjured testimony.*

Finally, the Fifth Circuit Court of Appeals found that Mr. McCabe had introduced perjured testimony. As in the prior instances of alleged misconduct, an attorney's use of testimony that he knew or should have known to be perjury would warrant the most severe form of discipline. Again the record fails to support that Mr. McCabe engaged in such activity.

The testimony in question is that of the president of CTR, another officer of CTR, and a certified public accountant (CPA) of CTR. All of this testimony was characterized by the judge as "unworthy of belief" in his unpublished August 7, 1986, opinion.

The president of CTR was called by NASCO, not Mr. McCabe. She testified that she signed some leases in 1983 and 1984. She denied that the leases were backdated. When confronted with the fact that she had signed her married name on a date prior to her marriage, she testified that she did not know when she signed the leases.

---

[17]The dates on the leases had been whited out and backdated. In addition, the equipment was purchased by the lessee, not the lessor. All of this was done prior to Mr. McCabe's representation of clients.

The other officer, first called by NASCO, testified that he did not sign the lease on the date it says; all the leases were signed in 1986; and he believed they were signed in 1986 for a tax advantage. He was then shown the original leases. When called subsequently by Mr. Rider, an attorney in Mr. McCabe's office, the officer testified extensively about equipment purchased subsequent to 1983. The officer testified that only Exhibit B equipment, including items on clients' updated Exhibit B, was then being used to run the station. When questioned item by item, he testified that other equipment (including equipment subject to the leases) was used for production and was not necessary to the station because it was not then being used in the station. When questioned about NASCO's inventory, he testified that some items they had listed as owned by the station were in fact owned by American Telephone & Telegraph Company, National Broadcasting Company, or employees.

On cross-examination, NASCO easily demonstrated the officer's bias. In addition, the officer admitted that all the equipment subject to the leases had been in constant service at the television station until disconnected.

The CPA was called by Mr. McCabe. He testified that the possibility of leasing equipment was discussed in late 1983, or early in 1984, and that the assets acquired by CTR were transferred to CAL-TV by a paper transaction between parent and subsidiary. He was shown the original leases and was asked why they would be backdated. He testified that there was no accounting reason to backdate.

On cross-examination the CPA was asked when he had looked at the lease documents. He testified that he saw copies of the leases in the work papers for 1983 and 1984. He also testified that no work papers were injected into these files after they were closed.

While the judge was entitled to find this testimony "unworthy of belief," it is troubling that three years later, in his sanctioning opinion, he stated, "It was proved beyond doubt that all this testimony was perjury." *NASCO, Inc.* v. *Calcasieu Television & Radio, Inc.*, 124 F.R.D. at 145. There is,

of course, a wide gulf between testimony that a fact finder fails to believe and testimony that constitutes perjury.[18] The record does not show that any of the witnesses were charged with, much less found guilty of, perjury. Furthermore there is nothing to warrant the finding that Mr. McCabe participated in, counseled, or advised the witnesses in regard to the testimony found by the judge to be unworthy of belief.

The Fifth Circuit's opinion states, "Mr. McCabe also introduced testimony, characterized by the district court as 'perjury.' " *NASCO, Inc.* v. *Calcasieu Television and Radio, Inc.*, 894 F.2d at 709. Nowhere in the District Court's August, 1986, opinion, nor in the District Court's sanctioning opinion, is Mr. McCabe accused of introducing perjured testimony. The record does not support the conclusion that Mr. McCabe suborned perjury.

4. *Conclusion.*

It appears to us that given the history of this case, Mr. McCabe got caught in the vortex of justified anger and disbelief on the part of the District Court judge created by unethical and pettifogging conduct of other lawyers. The judge seemed unable to divorce Mr. McCabe's representation and minor part in this litigation from the whole. Indeed, at the beginning of the hearing on July 16, 1986, the judge stated:

> "It has long ago been stipulated in this lawsuit by all of the parties that the August 9th contract is legal and enforceable; and secondly that that contract was breached by the defendant . . . It seems to the court rather ridiculous with those stipulations that we should be here today, yet we have been here three years and there is not one single thing in this record that has been proved . . . There has never been one motive or reason advanced by the defendants for not performing this contract. The

---

[18]Perjury consists of intentional testimony by a person, while under oath, of a knowingly false statement of a material fact. Perjury is a crime, each element of which must be proved beyond a reasonable doubt. See 18 U.S.C. § 1621 (1988); La. Rev. Stat. Ann. § 14:123 (West 1986); G. L. c. 268, § 1 (1990 ed.).

real reason, whatever it may be, is not of record, but we are still here fighting in spite of the fact of those two stipulations that I have just referred to. Now, we have had other things, and *to be perfectly frank with you, Mr. McCabe, . . . your appearance here and the things that have been a part of your appearance and your motion seem to me part of the same strategy*" (emphasis added).

He went on to state,

"It seems to me that your not having anything to do with these proceedings or anything having to do with the negotiations, which are the subject, I think, of the July 1st motion, *gives the court grave doubt as to the defendant's purpose in retaining you now*" (emphasis added).

In carefully examining the record we find no support for assessing Mr. McCabe with sanctionable conduct.

Given the history of this case, Mr. McCabe should have been more alert to the pitfalls that may have been placed in his path by the conduct of others. The judge, early on in the status conference, indicated his difficulty with the way the case had been handled to date, and his anger at unethical behavior. Were there any evidence in the record linking Mr. McCabe with prior counsel's unethical strategy and behavior, we should necessarily come to a different conclusion. Our examination of the record, however, indicates no support for charging Mr. McCabe with sanctionable conduct.

The case is remanded to the single justice for entry of a judgment dismissing the information against Mr. McCabe.

*So ordered.*