803 So.2d 683 (2001)
THE FLORIDA BAR, Complainant,
v.
F. Lee BAILEY, Respondent.
No. SC96767.
Supreme Court of Florida.
November 21, 2001.
*685 John F. Harkness, Jr., Executive Director, and John Anthony Boggs, Staff Counsel, Tallahassee, FL; David Robert Ristoff, Branch Staff Counsel, and Debra Joyce Davis, Assistant Staff Counsel, Tampa, FL; and Terrance E. Schmidt, Jacksonville, FL, for Complainant.
Bruce Rogow and Beverly A. Pohl of Bruce S. Rogow, P.A., Fort Lauderdale, FL; Don Beverly; and Russell S. Bohn of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, FL, for Respondent.
P. Michael Patterson, United States Attorney, Tallahassee, FL, for the Northern District of Florida, Amicus Curiae.
PER CURIAM.
F. Lee Bailey seeks review of a referee's report finding numerous, serious violations of the Rules Regulating the Florida Bar and recommending permanent disbarment. We have jurisdiction. See art. V, § 15, Fla. Const. For the reasons that follow, we approve the referee's findings of guilt and order that F. Lee Bailey be disbarred.

FACTS
The Florida Bar filed a complaint against Bailey alleging seven counts of misconduct in violation of various Rules Regulating the Florida Bar in the course of Bailey's representation of his client, Claude Duboc.[1] After a final hearing was held over a number of days in which witnesses testified and exhibits were introduced into evidence, the referee issued a detailed twenty-four page report containing her findings of fact and conclusions of law. The referee began the report with an overview of the factual setting that provided the framework for further findings as to all counts of charged misconduct:
In 1994, Bailey represented Duboc in a criminal case filed against Duboc by the United States alleging violations of Title 21 of the United States Code, which prohibits drug smuggling. The indictment also included forfeiture claims under Title 18 of the United States Code. Bailey worked out a deal with the United States Attorneys ("U.S. Attorneys") covering Duboc's plea, repatriation of assets, and payment of attorneys' fees. Under the agreement, Duboc would plead guilty and forfeit all of his assets to the United States Government. All of Duboc's cash accounts from around the world would be transferred to an account identified by the U.S. Attorney's Office. To deal with the forfeiture of Duboc's real and personal property, 602,000 shares of Biochem Pharma ("Biochem") stock, valued at $5,891,352.00, would be transferred into Bailey's Swiss account. Bailey would use these funds to market, maintain and liquidate Duboc's French properties and all other assets. In order to put this unusual arrangement in context, we set forth the specific factual findings surrounding this plea agreement and Bailey's role in it:
The ultimate strategy employed by Respondent [Bailey] was that Duboc would plead guilty and forfeit all assets to the United States Government in the hopes of a reduction of sentence based on what [Bailey] described as "extraordinary cooperation." First, Duboc would identify and transfer all cash accounts from around the world into an account identified by the United States Attorney's Office.

*686 The forfeiture of the real and personal properties held in foreign countries presented some nettlesome problems. Duboc owned two large estates in France and valuable car collections, boats, furnishings and art works. Most of these properties were physically located in France. The two estates required substantial infusions of cash for maintenance.
The idea proposed by [Bailey] was to segregate an asset, a particular asset, one that would appreciate in value over time, so that when it came time for Duboc to be sentenced following entry of a plea of guilty, the United States Government would not argue in opposition to a defense claim that part of the appreciation in value was not forfeitable to the United States. Ultimately, the object was to sequester a fund which would not be entirely subject to forfeiture.
The identified asset was 602,000 shares of Biochem Pharma Stock. This would serve as a fund from which [Bailey] could serve as trustee and guardian of Duboc's French properties. Duboc's primary interest was to maximize the amount of forfeitures that would be turned over to the United States. This stock would provide a sufficient fund from which to market, maintain and liquidate the French properties and all other assets. [Bailey] explained that it would be prudent to hold the Biochem stock because the company was conducting promising research on a cure for AIDS, and the loss the government would suffer if large blocks of stock were dumped on the market.
Money was transferred immediately into a covert account identified by the United States Attorney's Office. Duboc provided written instructions to the various financial institutions and the orders were then faxed. On April 26, 1994, the Biochem stock certificates were transferred to [Bailey's] Swiss account at his direction. The Respondent provided the account number.
On May 17, 1994, United States District Court Judge Maurice Paul held a pre-plea conference in his chambers. At the conference, the following arrangement as to attorneys' fees, including those for Bailey, was reached: "[T]he remainder value of the stock which was being segregated out would be returned to the court at the end of the day, and from that asset the Judge would bea motion would be filed for a reasonable attorney's fee for Mr. Bailey." Later in the day on May 17, Duboc pled guilty to two counts in open court and professed his complete cooperation with the U.S. Attorney's Office.
Having outlined these predicate findings of fact, the referee then made the following factual findings and recommendations as to guilt in the context of each count of misconduct as alleged by the Bar in its complaint.
Count I of the Bar's complaint charged Bailey with commingling. Bailey was entrusted with liquidating stock that belonged to Duboc, referred to as "the Japanese Stock." Upon liquidation, Bailey was then to transmit the proceeds to the United States. Bailey sold the Japanese stock and deposited approximately $730,000 into his Credit Suisse account on or about July 6, 1994. Bailey then transferred the money into his Barnett Bank Money Market Account. The money was paid to the United States Marshal on or about August 15, 1994. The referee found that Bailey admitted that his money market account was not a lawyer's trust account, nor did Bailey create or maintain it as a separate account for the sole purpose of maintaining the stock proceeds. In concluding that Bailey had engaged in commingling, the *687 referee rejected Bailey's claims that there were no personal funds in the Barnett Bank account at the time Bailey transferred the funds from the Japanese Stock into this account, and that Bailey's deposit of the proceeds into a non-trust account was "inadvertent error." The referee concluded that Bailey violated Rule Regulating the Florida Bar 4-1.15(a) by failing to set up a separate account for these funds and also by commingling client funds with his personal funds.
Count II of the Bar's complaint charged Bailey with misappropriating trust funds and commingling. On or about May 9, 1994, the 602,000 shares of Biochem stock were transferred into Bailey's Credit Suisse Investment Account. Bailey sold shares of stock and borrowed against the stock, deriving over $4 million from these activities. Bailey then transferred $3,514,945 of Biochem proceeds from the Credit Suisse account into his Barnett Bank Money Market Account. Bailey had transferred all but $350,000 of these proceeds into his personal checking account by December 1995. From this account, Bailey wrote checks to his private business enterprises totaling $2,297,696 and another $1,277,433 for other personal expenses or purchases. Bailey further paid $138,946 out of his money market account toward the purchase of a residence.
The referee rejected Bailey's two defenses to the Bar's charge of misappropriation: (1) he never held the stock in trust for Duboc or the United States; rather, it was transferred to him in fee simple absolute; and (2) this stock was not subject to forfeiture. The referee found Bailey guilty of violating Rules Regulating the Florida Bar 3-4.3 (lawyer shall not commit any act that is contrary to honesty and justice), 4-1.15(a) (commingling funds), 4-8.4(b) (lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer), 4-8.4(c) (lawyer shall not engage in conduct involving deceit, dishonesty, fraud or misrepresentation), and 5-1.1 (requiring money or other property entrusted to an attorney to be held in trust and applied only for a specific purpose).
Count III charged Bailey with continuing to expend Biochem funds in contravention of two federal court orders. In January 1996, Judge Paul issued two orders regarding the Duboc criminal case; one on the 12th and the other on the 25th. The January 12 order relieved Bailey as Duboc's counsel, substituting the Coudert Brothers law firm. The order further required Bailey to give within 10 days "a full accounting of the monies and properties held in trust by him for the United States of America." The order froze all of the assets received by Bailey from Duboc and further prohibited their disbursement. The January 25 order directed Bailey to bring to a February 1, 1996, hearing all of the shares of Biochem stock that Duboc had turned over to Bailey. The referee found that Bailey continued to use the Biochem proceeds that he held in trust after service and knowledge of the January 12 and January 25, 1996, orders. The referee rejected Bailey's argument that the January 25 order did not restrain him from utilizing the funds to meet his prior financial obligations, finding that "the order... require[d] Respondent to bring with him the Biochem Pharma stock or any replacement asset.... Clearly there were judicial restraints in place when the money was disbursed."
The referee found Bailey guilty of violating Rules Regulating the Florida Bar 3-4.3 (lawyer shall not commit an act that is contrary to honesty and justice), rule 4-8.4(b) (lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a *688 lawyer), rule 4-8.4(c) (lawyer shall not engage in conduct involving deceit, dishonesty, fraud or misrepresentation), and rule 5-1.1 (requiring money or other property entrusted to an attorney to be held in trust and applied only for a specific purpose). The referee further found that by knowingly expending trust account funds from the money market account after entry of the January 12 order, Bailey violated Rules Regulating the Florida Bar 3-4.3, 4-3.4(c) (lawyer shall not knowingly disobey an obligation under the rules of a tribunal), 4-8.4(a) (lawyer shall not violate the Rules of Professional Conduct), and 4-8.4(d) (lawyer shall not engage in conduct that is prejudicial to the administration of justice).
Count IV of the Bar's complaint charged Bailey with giving false testimony. The referee found that Bailey testified falsely before Judge Paul and the U.S. Attorneys that he did not see the January 12 or January 25 orders until the morning of a civil contempt hearing held on February 2, 1996. The referee further found that Bailey was not being truthful when: (1) in his answer to the Bar's complaint, Bailey denied that he had received the orders and that he had testified falsely before Judge Paul; and (2) Bailey testified before the referee at the final hearing.
Specifically, the referee found numerous reasons why this testimony was false. First, Bailey had a conversation with the Assistant U.S. Attorney about the terms of the January 12 order following its entry. Indeed, on January 19, when Bailey met with the Assistant U.S. Attorneys, he accused them of obtaining the order from the judge ex parte. In addition, when Bailey returned to his Palm Beach office on January 18, he marshaled documents in support of the accounting that the January 12 order required him to provide. In the letter to Judge Paul dated January 21, 1996, Bailey "plainly concedes that he knew of the terms of the order as early as January 16, 1996." In that letter, he referred to the manner, mode and method by which Judge Paul entered the order. He complained in the letter that "Your Honor was persuaded to act on representations which are at a minimum subject to sharp challenge." As the referee notes, "these assertions could not have been made unless [Bailey] had seen the January 12 order." Further, as to the January 25, 1996, order, it was served upon Bailey by "fax transmission, United States mail, and personally by the U.S. Marshal's Service pursuant to the very terms of the order." Based on these factual findings, the referee found Bailey guilty of violating Rules Regulating the Florida Bar 3-4.3, 4-8.4(b), 4-8.4(c), and 4-3.3(a)(1) (lawyer shall not knowingly make a false statement of material fact or law to a tribunal).
Count V of the Bar's complaint charged Bailey with self-dealing in the course of his representation of Duboc. The referee found that Bailey's claim that he owned the stock in fee simple created a financial conflict of interest between Bailey and Duboc. "The more [Bailey] received, the less his client would produce in his column at the time of sentencing." This finding refers to the fact that under the plea agreement, it was in Duboc's interest to maximize the amount of assets he forfeited to the United States Government in hopes of receiving a reduced sentence, and that for Bailey to claim entitlement to the appreciation of the stock would be directly contrary to the interests of his client. The referee concluded that Bailey's claim of entitlement to the stock was in no way consistent with the premise that ultimate approval and payment of fees rested with Judge Paul.
The referee further found that Bailey used information relating to his representation of Duboc to the disadvantage of his *689 client. The referee found that Bailey managed one of the French properties to his own personal benefit by procrastinating in his efforts to sell the property. The referee ultimately concluded that Bailey had engaged in self-dealing, and therefore violated Rules Regulating the Florida Bar 4-1.7(b) (lawyer shall not represent a client if lawyer's exercise of independent professional judgment may be materially limited by the lawyer's own interest), 4-1.8(a) (lawyer shall not knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client), and 4-1.8(b) (lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation).
Count VII of the Bar's complaint charged Bailey with ex parte communications, self-dealing, and disclosure of confidential information. In connection with this count, the referee found that on May 17, 1994, Duboc appeared before Judge Paul and entered a plea and cooperation agreement. Duboc pled guilty to counts II and III of the indictment. The referee found that the only way Duboc would get a reduced sentence was if Judge Paul was convinced that Duboc had completely and totally cooperated and had forfeited all of his assets to the United States. On January 4, 1996, Bailey wrote a letter to Judge Paul stating, "I have sent no copies of this letter to anyone, since I believe its distribution is within Your Honor's sound discretion." (Emphasis added.) This letter contains an express admission that it was ex parte. In this ex parte letter to Judge Paul, Bailey stated that: (1) Duboc pled guilty because he had no defense due to the strength of the case, (2) Duboc chose this course because it was his only option, not in a spirit of remorse or cooperation, (3) Duboc was a "multimillionaire druggie," (4) by consulting with other counsel, Duboc was no longer acting in the spirit of cooperation, and (5) Duboc's new defense team had interests contrary to those of his client and the court. Bailey sent a second letter to Judge Paul on January 21, 1996, a copy of which was sent to the U.S. Attorney's Office, threatening to seek an order to invade the attorney-client privilege in an attempt to defeat Duboc's position that the stock was held in trust.
The referee found that both of Bailey's letters were sent to compromise Duboc before the sentencing judge and to protect Bailey's interest and control of Duboc's and the U.S. Government's money. The referee recommended that Bailey be found guilty of violating Rules Regulating the Florida Bar 4-1.6(a) (lawyer shall not reveal information relating to representation of a client), 4-1.8(a), 4-1.8(b), 4-3.5(a) (lawyer shall not seek to influence a judge), 4-3.5(b) (in an adversary proceeding, lawyer shall not communicate as to the merits of the cause with a judge).
Having made the above findings of fact and recommendations as to guilt, the referee considered the appropriate discipline for Bailey's misconduct:
Preliminarily, the referee noted that Bailey was 67 years old at the time of the report. He has been a member of The Florida Bar since 1989, and was admitted to the Massachusetts Bar in 1960. The referee further states "[a]ccording to the Respondent, he is a member of The Supreme Court of the United States, every circuit in the United States, the Tax Court, the Federal Court of Claims, and as of the time of the hearing was admitted in North Carolina and California pro hac vice on two cases."
Prior to considering any aggravating or mitigating factors, the referee stated that "any of the violations of the rules regulating the Florida Bar which have been proven by the Bar as set forth above, would *690 singularly warrant the recommended discipline [of disbarment]. Collectively, the numerous violations, all of which are serious and egregious, plainly warrant permanent disbarment." The referee then listed the following aggravating factors: dishonest or selfish motive, a pattern of misconduct, multiple offenses, submission of false statements, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law. Further, the referee considered that a federal judge recently found Bailey to be in civil contempt in another case. The referee noted that Bailey has two prior disciplinary actions; a censure in Massachusetts in 1970 and a suspension for one year of the privilege of applying for permission to appear pro hac vice in New Jersey in 1971; however, these incidents were too remote in time to be considered in aggravation. The referee did not find any mitigation. Finally, the referee recommended that the Bar be awarded all reasonable costs. Bailey petitioned this Court for review, challenging multiple aspects of the referee's report.

ANALYSIS
In our system of discipline regulating the conduct of lawyers, our referees, who are circuit court judges, serve as the finders of fact. They hear the testimony of witnesses, judge their credibility, and receive evidence, as would be done in any trial in a court of law. As with any other fact finder, this Court will uphold a referee's findings of fact when they are supported by competent substantial evidence in the record below. See Florida Bar v. Jordan, 705 So.2d 1387, 1390 (Fla.1998). As we have explained, where the findings of fact are supported by competent substantial evidence, this Court will not reweigh the evidence and substitute our judgment as to the findings of fact of the referee. See Florida Bar v. Spann, 682 So.2d 1070, 1073 (Fla.1996). Nevertheless, in any Bar disciplinary case, and in particular a case where the recommendation is disbarment, the most severe penalty we can administer to an attorney, we engage in a careful and thorough review of the record. Having reviewed the extensive record before us, we conclude that there is competent substantial evidence to support the referee's findings of fact and conclusions of guilt as to each count of misconduct. Although each of the rule violations is extremely serious, ranging from trust account violations to misappropriation of funds, lying to a federal judge, self-dealing and compromising the position of a client, we focus on Bailey's actions regarding the Biochem stock (count II) because the gist of his defense in this case was that the Bar never established the stock was to be held by Bailey in trust. In connection with this, we also review whether, regardless of Bailey's claim that the stock had been transferred to him in "fee simple," this claimed right to the stock would permit him to act in disregard of the judge's orders (count III).
The Biochem Pharma Stock (Count II)The most contested issue in this case is whether a trust was created with the transfer of the Biochem stock from Duboc to Bailey. The Bar argued that the plea agreement with the U.S. Government provided that Bailey was to hold the stock in trust for the benefit of the U.S. Government. Bailey would use the stock to maintain and liquidate Duboc's properties. After this was accomplished, the stock or its replacement assets would be forfeited to the United States in order to maximize any benefit to Bailey's client for his cooperation. However, Bailey argued that the stock was transferred to him in fee simple. He agreed that he was required to utilize the Biochem stock to derive the funds necessary to maintain and *691 liquidate the French properties. However, Bailey asserted that after the properties were sold, he was only accountable to the United States for the value of the stock on the date that Duboc transferred it to Bailey's Swiss account (which was approximately $6 million), and not for any appreciationwhich, as of January 1996, amounted to over $10 million. In other words, Bailey claims that he was entitled to all of the Biochem stock and proceeds from the sale of the stock, minus the approximate $6 million for which he was accountable to the U.S. Government. As he wrote Judge Paul in his letter of January 21, 1996:
I viewed [the value of the stock of $5,891,352.00 on May 9, 1994] as an account in which the United States had an interest to this extent: after the payment of costs associated with the case and fees approved by Your Honor, any balance of the $5,891,352.00 remaining would revert to the United States. Because of this view, I did not declare the funds to be income to myself.
(Emphasis omitted.)
We conclude that regardless of the manner in which he was to hold the stock, Bailey is guilty of the most serious and basic trust account violations. The stock, by his own admission, was given to Bailey by his client neither as a gift, nor as an earned fee. Rather, the stock was given to Bailey to be used for the benefit of Duboc, and ultimately the U.S. Government. Bailey was required to use the stock to maximize Duboc's forfeitures to the U.S. Government in the hope that Duboc would receive a reduction of sentence for his cooperation. In his January 21, 1996, letter to Judge Paul, even Bailey recognized that the U.S. Government had an interest in the transfer value of the Biochem stock. Nevertheless, from the day it was transferred to him, Bailey treated the money as his own.
Rule Regulating the Florida Bar 3-4.1[2] charges every member of the Bar with knowledge of the standard of ethical and professional conduct prescribed by this Court, and with notice of rule 3-4.1. Rule 4-1.15 provides:
A lawyer shall hold in trust, separate from the lawyer's own property, funds and property of clients or third persons that are in a lawyer's possession in connection with a representation. All funds, including advances for costs and expenses, shall be kept in a separate account maintained in the state where the lawyer's office is situated or elsewhere with the consent of the client or third person, provided that funds may be separately held and maintained other than in a bank account if the lawyer receives written permission from the client to do so and provided that such written permission is received prior to maintaining the funds other than in a separate bank account. In no event may the lawyer commingle the client's funds with those of the lawyer or those of the lawyer's law firm. Other property shall be identified as such and appropriately safeguarded.
(Emphasis added.) Bailey admits that he was accountable to the United States for the approximate $6 million value of the Biochem stock on the day of transfer. Nevertheless, when the stock was transferred, Bailey made absolutely no effort to segregate or safeguard this money. Rather, he commingled the money with the funds in his Credit Suisse account, sold shares of the stock, and obtained a line of *692 credit on the stock, deriving over $4,000,000 from these activities. As noted by the Bar at oral argument, if on January 1, 1996, the value of Biochem stock fell to zero, Bailey would have already taken $3.5 million out of the Biochem stock fund and transferred it to his personal money market account. Bailey transferred all but $350,000 of these proceeds into his personal checking account and used some or all of this money to pay for various business and personal expenses.
Further and importantly, Bailey admits that Judge Paul would approve the amount of Bailey's fee for representing Duboc, and that his fee would be taken from the approximate $6 million value of the Biochem proceeds. Therefore, even if some of the initial $6 million corpus was to be used for payment of an attorneys' fee, Bailey was not entitled to the fee until it was approved by Judge Paula fact that Bailey admits in his January 21 letter to Judge Paul, and that he admits in this case. Indeed, in a letter written to his own client, Duboc, before a falling out occurred, Bailey explained that:
You do not face the dilemma since I will be paid with Chief Judge Paul's approval only that amount which is commensurate with the result achieved in your case, and the amount of work that went into it. Our interests are therefore in perfect alignment.
Rule 5-1.1(a) provides: "Money or other property entrusted to an attorney for a specific purpose, including advances for costs and expenses, is held in trust and must be applied only to that purpose." When the approximate $6 million transfer value of the Biochem stock was given to Bailey, it was given to him for specific purposes: to maintain the property of his client and then to return the remainder to the U.S. Government. Therefore, under Rule Regulating the Florida Bar 5-1.1, Bailey had a duty to safekeep this property and use it only for the aforementioned purposes. The transfer value of this stock or its proceeds could neither be commingled nor could it be withdrawn. The fact that a portion of this fund was to be used for payment of any attorneys' fees only serves to highlight this factthat the monies were to be held in trust for a specific purpose.
If Bailey's fee had been earned, then it could have and should have been withdrawn from a trust account; the failure to do so would have been a violation of trust account rules. See Florida Bar v. Tillman, 682 So.2d 542 (1996) (holding that rule 4-1.15(c) requires fees to be withdrawn when they become due and the failure to do so constitutes a trust account violation). However, if money is given to a client to be applied to fees when they become earned, much like a retainer, these monies cannot be withdrawn from a trust account and spent until they are earned. See In re Sather, 3 P.3d 403, 410 (Colo. 2000) ("[U]nearned portion[s] of ... advance fees must be kept in trust and cannot be treated as the attorney's property until earned."). In this case, by express agreement, Bailey was not entitled to any fees until determined and approved by Judge Paul. Thus, he was expressly prohibited from withdrawing and spending any portion of the stock for his own personal benefit until approved by Judge Paul. See generally Spann, 682 So.2d at 1070-71.
In light of the foregoing, we conclude that regardless of the manner in which the stock was transferred to Bailey and the exact words used, Bailey violated rule 4-1.15 and rule 5-1.1(a) as to approximately $6 million (i.e., the value of the stock at the *693 time it was transferred to Bailey).[3]
We further note that even if there was no precise agreement with the U.S. Government regarding the necessity to segregate and safeguard the stock and its proceeds, Bailey's obligations as to his client's property or the property of a third party flow from the Rules Regulating the Florida Bar, rules that are imposed as a condition of all attorneys' membership in The Florida Bar. Indeed, one of the most solemn obligations that separate lawyers from any other professionals relates to the safeguarding and segregation of a client's property.
The January 12 and January 25 orders (Count III)Judge Paul's January 12, 1996, order provides that "[a]ll monies, real and personal property and other assets received by Bailey from or on behalf of Duboc, including the aforementioned Biochem Pharma stock shall be frozen as of the date of this order and no further disbursement of any of these funds shall be made unless authorized by this Court." The January 25 order required Bailey to "bring with him all shares of stock of Biochem Pharma, Inc. held by him, or by others, which represent the stock turned over to him by the Defendant, Claude Duboc, or Duboc's representatives. If the Biochem Pharma, Inc. stock has been replaced by any other form of asset while in the possession of Mr. Bailey, then the replacement stock will be brought to this Court at the time of the above hearing."
As mentioned earlier, Bailey took no action to segregate or safeguard the value of the Biochem proceeds for which he admits he was accountable to the United States. Because Bailey held approximately $6 million in trust for the Government, and Bailey commingled money from the Biochem proceeds with his personal assets, we conclude that Judge Paul's orders covered that portion of the Biochem proceeds that Bailey was holding in his money market account or his personal checking account.
Even if Bailey felt that he was entitled to the stock proceeds in his personal account, this does not permit him to act in contravention of two federal court orders. In Florida Bar v. Gersten, 707 So.2d 711, 713 (Fla.1998), this Court found that an attorney who failed to comply with a court order violated rule 4-3.4(c). The Court stated that "[a]n attorney is not permitted to ignore and refuse to follow a court order based upon his personal belief in the invalidity of that order. To countenance that course is to court pandemonium and a breakdown of the judicial system." Id. (quoting Florida Bar v. Rubin, 549 So.2d 1000, 1003 (Fla.1989)). Similarly, in Florida Bar v. Canto, 668 So.2d 583 (Fla.1996), this Court found that an attorney who continued to litigate a case despite being disqualified from the case had violated rules 3-4.3, 4-3.4(c), 4-8.4(a), and 4-8.4(d), in addition to other rules. We found that "Canto's repeated refusal to accept the directives of the court are of a most serious order. The record contains unrefuted evidence of the injury he has caused his former clients, third parties, and the courts. Such disdain for the legal system simply can not be tolerated." Id. at 585. Bailey's disregard of the January 12 and January 25 orders requiring him not to utilize or expend Biochem proceeds similarly demonstrates disdain for the federal court that issued those orders. Therefore, we conclude that Bailey violated rules 3-4.3, 4-3.4(c), 4-8.4(a) and 4-8.4(d) by acting *694 in contravention of Judge Paul's orders.

DISCIPLINE
Bailey has committed multiple counts of egregious misconduct, including offering false testimony, engaging in ex parte communications, violating a client's confidences, violating two federal court orders, and trust account violations, including commingling and misappropriation. Disbarment is the presumed discipline for many of these acts of misconduct. For example, as to Bailey's mishandling of the Biochem stock, Standard 4.11 of the Florida Standards for Imposing Lawyer Sanctions provides: "Disbarment is appropriate when a lawyer intentionally or knowingly converts client property regardless of injury or potential injury." As to Bailey's violation of the January 12 and 25 orders, Standard 6.21 provides that "[d]isbarment is appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes ... potentially serious interference with a legal proceeding." Regarding Bailey's ex parte communication with Judge Paul, Standard 6.31 provides that "[d]isbarment is appropriate when a lawyer: ... (b) makes an unauthorized ex parte communication with a judge or juror with intent to affect the outcome of the proceeding."
Case law also supports disbarment for the types of misconduct committed by Bailey. See Florida Bar v. Rightmyer, 616 So.2d 953, 955 (Fla.1993) (holding that "[n]o breach of professional ethics, or of the law, is more harmful to the administration of justice or more hurtful to the public appraisal of the legal profession than the knowledgeable use by an attorney of false testimony in the judicial process"); Florida Bar v. Leon, 510 So.2d 873 (Fla.1987) (attorney disbarred for engaging in ex parte communication with judge to achieve alteration of sentences and then lying under oath to Judicial Qualifications Commission). Further, "[t]his Court deals more severely with cumulative misconduct than with isolated misconduct." Florida Bar v. Greenspahn, 386 So.2d 523, 525 (Fla.1980); see also Spann, 682 So.2d at 1074.
Bailey has committed some of the most egregious rules violations possible, evidencing a complete disregard for the rules governing attorneys. "[M]isuse of client funds is one of the most serious offenses a lawyer can commit. Upon a finding of misuse or misappropriation, there is a presumption that disbarment is the appropriate punishment." Tillman, 682 So.2d at 543. Bailey's false testimony and disregard of Judge Paul's orders demonstrate a disturbing lack of respect for the justice system and how it operates. Bailey's self-dealing and willingness to compromise client confidences are especially disturbing. Not only did Bailey use assets that his client intended to forfeit to the U.S. Government for Bailey's own purposes, but Bailey also attempted to further his own interests by disparaging his client in an ex parte letter to the judge who would sentence his client. Bailey's self-dealing constitutes a complete abdication of his duty of loyalty to his client. His willingness to compromise his client for personal gain shows an open disregard for the relationship that must be maintained between attorney and client: one of trust, and one where both individuals work in the client's best interest. Such misconduct strikes at the very center of the professional ethic of an attorney and cannot be tolerated. As we have repeatedly stated, discipline must serve three purposes:
First, the judgment must be fair to society, both in terms of protecting the public from unethical conduct and at the same time not denying the public the *695 services of a qualified lawyer as a result of undue harshness in imposing penalty. Second, the judgment must be fair to the respondent, being sufficient to punish a breach of ethics and at the same time encourage reformation and rehabilitation. Third, the judgment must be severe enough to deter others who might be prone or tempted to become involved in like violations.
Florida Bar v. Brake, 767 So.2d 1163, 1169 (Fla.2000) (quoting Florida Bar v. Cibula, 725 So.2d 360, 363 (Fla.1998)).
In light of Bailey's egregious and cumulative misconduct, and the absence of any mitigating factors, we conclude that disbarment is not only appropriate in this case, but necessary to fulfill the threefold purpose of attorney discipline. By this disbarment, Bailey's status as a member of The Florida Bar shall be terminated and he may not reapply for readmission for a period of five years, and then he may "only be admitted again upon full compliance with the rules and regulations governing admission to the bar." R. Regulating Fla. Bar 3-5.1(f). This includes retaking the Florida bar examination, complying with the rigorous background and character examination, and demonstrating knowledge of the rules of professional conduct required of all new admittees.[4]

CONCLUSION
Accordingly, F. Lee Bailey is hereby disbarred from the practice of law in the State of Florida. The disbarment will be effective thirty days from the filing of this opinion so that Bailey can close out his practice and protect the interests of existing clients. If Bailey notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the disbarment effective immediately. Bailey shall accept no new business from the date this opinion is filed until he is readmitted to the practice of law in Florida. Judgment is entered for The Florida Bar, 650 Apalachee Parkway, Tallahassee, Florida 32399, for recovery of costs from F. Lee Bailey in the amount of $24,418.60, for which sum let execution issue.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
NOTES
[1] Count number six of the Bar's complaint was dismissed and is therefore not discussed further.
[2] Rule 3-4.1 provides, "Every member of the Florida Bar ... is within the jurisdiction of this court ... and is charged with notice and held to know the provisions of this rule and the standards of ethical and professional conduct prescribed by this court."
[3] We approve the referee's other findings regarding rule violations under this count without further discussion.
[4] Although we regard these rule violations as extremely serious and warranting disbarment, we do not accept the referee's recommendation of permanent disbarment. Under the rules, the minimum period of disbarment is for five years (and thereafter until the attorney is readmitted to the practice of law.) See R. Regulating Fla. Bar 3-5.1(f). In 1998, the Court amended the Rules Regulating the Florida Bar to specifically provide for permanent disbarment. See In re Amendments to Rules Regulating The Florida Bar, 718 So.2d 1179, 1181 (Fla.1998) (amending rule 3-5.1(f) "to authorize permanent disbarment as a disciplinary sanction").