## In the Matter of F. Lee Bailey.

Suffolk. December 2, 2002. - April 11, 2003.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Attorney at Law,* Disciplinary proceeding, Disbarment, Reciprocal discipline.

Statement of the standard of review of reciprocal discipline of an attorney after another jurisdiction has reached a final adjudication that the attorney has been guilty of misconduct. [136]

This court concluded that Florida bar disciplinary proceedings against an attorney admitted in both the Commonwealth and in Florida provided the attorney a fair hearing. [137]

In a Florida bar disciplinary proceeding against an attorney admitted in both the Commonwealth and in Florida, the evidence was sufficient to prove that the attorney misappropriated client funds, commingled them with his own funds, and used them for his own purposes. [137-148]

The presumptive sanction of disbarment for an attorney's intentional misappropriation of a client's funds, resulting in actual deprivation, was appropriate, where the intentional misappropriation was compounded by the attorney's giving false testimony under oath; his violating court orders; his deliberately communicating ex parte with a judge in an attempt to influence the ruling on a pending motion; his revealing client confidences in letters to the judge, in a manner that was disparaging to the client, and for the purpose of furthering the attorney's own interests, contrary to his client's desire to change counsel; his knowing commingling of other funds; and his self-dealing in delaying the sale of his client's property. [148-152]

PETITION for reciprocal discipline filed in the Supreme Judicial Court for the county of Suffolk on December 3, 2001.

The case was heard by *Ireland,* J.

*J. Owen Todd & Joseph J. Balliro (Edward Foye* with them) for the respondent.

*Nancy E. Kaufman,* Assistant Bar Counsel.

SOSMAN, J. On November 21, 2001, the Supreme Court of Florida disbarred attorney F. Lee Bailey for "multiple counts of egregious misconduct, including offering false testimony, engaging in ex parte communications, violating a client's confidences, violating two federal court orders, and trust account violations,

including commingling and misappropriation." *Florida Bar* v. *Bailey*, 803 So. 2d 683, 694 (Fla. 2001), cert. denied, 535 U.S. 1056 (2002) (*Bailey*). Shortly thereafter, bar counsel filed a petition for reciprocal discipline. Bailey sought to stay the matter until the United States Court of Federal Claims decided a contract action he had brought against the United States government arising out of the underlying case in which the misconduct had occurred.[1] In addition, Bailey requested permission to file the entire record of the Court of Federal Claims proceedings, along with the record of the disciplinary proceedings in Florida, and sought a de novo hearing on the matter of his discipline. On March 7, 2002, a single justice of this court entered a judgment of disbarment, from which Bailey now appeals.

Bailey argues that this court should vacate the judgment of disbarment and remand the case with instructions to appoint a hearing committee for the task of reviewing, at the very least, a complete record of the proceedings before the Florida Bar and the Court of Federal Claims and, thereafter, issuing its own findings of fact concerning his conduct in Florida. In support of what he admits is an unprecedented approach to a matter of reciprocal discipline, Bailey contends that the evidence against him in the Florida proceedings was insufficient to support the findings with respect to some (but not all) of the violations and argues that the trial before the Court of Federal Claims has produced more comprehensive and reliable evidence concerning the events underlying the alleged violations. He predicts that a review of the evidence in that trial will convince a hearing committee that he had a right to the funds in question and thus did not misappropriate his client's money when he used those funds for his own purposes.

We conclude that the evidence adduced in the Florida proceedings was sufficient to support the findings with respect to all the violations; that nothing in the Court of Federal Claims

---

[1] Specifically, Bailey contended that he had an agreement with the United States government that he could keep certain funds of his client that would otherwise have been forfeited as proceeds of drug trafficking. If, as he claimed, those funds were his and not his client's, he could not have misappropriated them. While this matter was pending, the United States Court of Federal Claims ruled against Bailey, holding that he had no contractual right to the funds at issue. *Bailey* v. *United States*, 54 Fed. Cl. 459, 498 (2002).

proceedings (which have since been concluded adversely to Bailey's position, see note 1, *supra*) undermines either the fairness of the Florida proceedings or the sufficiency of the evidence; and that, under our own rules, the multiple violations established by those Florida proceedings warrant disbarment. We therefore affirm the judgment of the single justice.

1. *Standard of review of reciprocal discipline.* "A final adjudication in another jurisdiction that a lawyer has been guilty of misconduct . . . may be treated as establishing the misconduct for purposes of a disciplinary proceeding in the Commonwealth." S.J.C. Rule 4:01, § 16 (5), as appearing in 425 Mass. 1319 (1997). In reviewing reciprocal discipline, "[t]he judgment of suspension or disbarment shall be conclusive evidence of the misconduct unless bar counsel or the respondent-lawyer establishes, or the court concludes, that the procedure in the other jurisdiction did not provide reasonable notice or opportunity to be heard or there was significant infirmity of proof establishing the misconduct." S.J.C. Rule 4:01, § 16 (3), as appearing in 425 Mass. 1319 (1997). In deference to the procedures of other States, "we generally give effect to the disciplinary decisions of another jurisdiction without undertaking the often difficult and protracted task of redoing the inquiry which has already been concluded there." *Matter of Lebbos*, 423 Mass. 753, 755 (1996), cert. denied, 520 U.S. 1275 (1997). However, the imposition of reciprocal discipline is not automatic. *Id.* at 755-756, citing *Matter of McCabe*, 411 Mass. 436 (1991). Rather, "Rule 4:01, § 16, implicitly adopts a modified rule of res judicata whereby the disciplinary action taken by a foreign jurisdiction will be adopted unless: '(a) the procedure in the other jurisdiction did not provide notice or opportunity to be heard; (b) there was significant infirmity of proof establishing the misconduct; (c) imposition of the same discipline would result in grave injustice; or (d) the misconduct established does not justify the same discipline in this Commonwealth.' " *Matter of Lebbos, supra* at 756, quoting S.J.C. Rule 4:01, § 16 (3). Accordingly, our inquiry "is generally limited to determining whether the attorney received a fair hearing at which sufficient evidence was presented to justify our taking reciprocal disciplinary action." *Matter of Lebbos, supra.*

2. *Fairness of the Florida proceedings.* The Florida proceedings provided Bailey a fair hearing. The referee — a Florida Circuit Court judge — conducted a five-day evidentiary hearing, issued a lengthy and detailed opinion, and found multiple violations by clear and convincing evidence, a higher standard of proof than the preponderance of evidence standard applied to disciplinary proceedings in this Commonwealth. See *Matter of Kerlinsky,* 428 Mass. 656, 664 n.10 (1999); *Matter of Budnitz,* 425 Mass. 1018, 1018 n.1, cert. denied, 526 U.S. 1160 (1997). The Supreme Court of Florida then conducted its own review of the entire record before adopting the referee's findings and ordering Bailey's disbarment. *Bailey, supra* at 690. Bailey had ample notice and opportunity to be heard, as well as the opportunity to raise before the Supreme Court of Florida any defects in the referee's conduct of his hearing. See *Matter of Lebbos, supra* at 756-757 (noting reluctance to reexamine claimed defects in California disciplinary proceedings "where an appellate forum exists in that jurisdiction which may and did address these particular concerns"). Bailey's complaints that the referee and the Supreme Court of Florida refused to reopen the record to allow him to submit additional evidence, and his insinuation that the referee was biased against him, do not suffice to demonstrate any defect in the procedural fairness of the Florida proceedings.

3. *Sufficiency of the evidence.* Bailey contends that the evidence submitted in the Florida proceedings was insufficient to prove that he misappropriated client funds.[2] The chronology of events underlying the findings of violation is largely undisputed. Bailey's dispute with the referee's conclusions centers on the inferences to be drawn from those facts, inferences that are ostensibly bolstered by additional evidence later adduced at the trial of his Federal contract claim, and legal arguments concerning whether the facts found amount to a misappropriation of funds. The facts found by the referee, amplified by uncontested facts in the record, are summarized as follows.

[2] Bailey's arguments with respect to the sufficiency of the evidence pertain only to the finding that he misappropriated funds. His arguments with respect to the remaining violations are limited to a claim that those other violations would not warrant disbarment.

a. *Facts.* In 1994, Claude Duboc was indicted by a Federal grand jury on charges alleging drug smuggling and money laundering. In that criminal proceeding, the United States also sought the forfeiture of all proceeds of Duboc's alleged drug trade. Duboc retained Bailey (along with two other lawyers) to represent him in that matter. At initial meetings with the prosecutors from the United States attorney's office for the northern district of Florida, Bailey ascertained that the case against Duboc was overwhelming. He also learned that the assets the government sought to forfeit were vast and far flung, consisting of cash and securities held in accounts in different countries, a collection of classic automobiles, yachts, artwork, houses in Canada, and two mansions in France.[3] Recognizing that the government would, despite the strength of its case against Duboc, experience difficulty in locating and forfeiting the full array of Duboc's assets in various foreign countries, Bailey pursued a strategy of pledging Duboc's utmost cooperation with those forfeitures in the hope that that "stunning" and "extraordinary" cooperation would be favorably considered at the time of sentencing following pleas of guilty.[4]

In discussions with the prosecutors pertaining to the planned voluntary forfeiture of assets, problems with particular assets emerged. One problem was the two French estates, which required substantial infusions of cash for maintenance pending their liquidation. (The United States marshal service could not undertake to perform such property maintenance tasks in a foreign country.) Bailey therefore agreed that he would maintain those estates, arrange for their sale, and turn the proceeds over to the Federal authorities for forfeiture. In order to provide Bailey with a source of funds for the upkeep of the properties (and a source for his own fees), the prosecutors initially proposed that, in lieu of forfeiting one of Duboc's cash accounts (which then contained approximately $3.5 million), the account would be transferred to Bailey.

---

[3]*Duboc had no legitimate income. Everything he owned was the product of his drug business, and all of it was therefore subject to a forfeiture proceeding.*

[4]*Duboc would plead guilty to two counts of the indictment. One count carried a minimum mandatory sentence of from ten years to life in prison; the other count carried a maximum sentence of twenty years in prison.*

At the same time, however, Bailey expressed concern about another of Duboc's assets, namely, his 602,000 shares of stock in a pharmaceutical company named Biochem Pharma (Biochem). Biochem was engaged in promising research on a cure for AIDS; Duboc and Bailey felt strongly that the Biochem stock would appreciate in value; and the immediate liquidation of a substantial block of Biochem shares would substantially depress the value of the stock.[5] To address that problem, Bailey and the Federal prosecutors and agents agreed that, instead of the $3.5 million cash account, the Biochem stock would be transferred to Bailey to be used for the purpose of paying the upkeep on the French estates. It was also understood that Bailey could look to the Biochem stock as the source from which to recover his attorney's fees, recognizing, however, that any fees to be taken from that asset would require the approval of the judge presiding over the criminal forfeiture proceeding, and there was no guarantee as to whether or in what amount the judge would allow any attorney's fees to be paid from a forfeitable asset.[6] One of the assistant United States attorneys also warned Bailey that, in accepting the Biochem stock instead of the $3.5 million cash account, the risk that the stock would decrease in value was being borne by Bailey — that stock would be the sole source from which to pay for the maintenance of the estates that Bailey had undertaken to provide, and the sole source from which any fees could possibly be recovered. In accordance with this understanding, the Biochem stock was transferred to Bailey's account in a Swiss bank on April 26, 1994. At that time, the 602,000 Biochem shares were valued at $5,891,352.

On May 17, 1994, Judge Maurice Paul, the United States District Court judge presiding over Duboc's case, conducted a conference in his chambers preparatory to taking Duboc's change of plea. At that conference, the parties explained their arrangement with respect to the Biochem stock as follows:

---

[5]The government's normal practice was to liquidate promptly any forfeited stock, and the participants apparently believed that the government was required to follow that practice even where it was expected that the stock would appreciate in value.

[6]An attorney does not have a right to collect fees from assets that are subject to forfeiture. See *United States* v. *Monsanto*, 491 U.S. 600, 606-614 (1989).

"[T]he remainder value of the stock which was being segregated out would be returned to the court at the end of the day, and from that asset the Judge would be — a motion would be filed for a reasonable attorney's fee for Mr. Bailey." Duboc's written plea agreement (signed by both Duboc and Bailey) committed Duboc to forfeit "all drug related assets," and recited that there were "no other agreements" between Duboc and the United States attorney. After the conference in chambers, Duboc pleaded guilty to two counts of the indictment and pledged his complete cooperation with the government in the marshaling and ultimate forfeiture of all his assets.

Meanwhile, on May 9, the shares of Biochem stock had been transferred to Bailey's Credit Suisse investment account. Bailey borrowed against the shares, garnering over $4 million in proceeds.[7] Bailey proceeded to transfer over $3.5 million of those proceeds to his money market account, and later transferred all but $350,000 from that account to his personal checking account. Drawing on those proceeds, Bailey wrote checks (totaling $2,297,696) to his private business enterprises, spent $1,277,433 for personal expenses and purchases, and spent another $138,946 toward the purchase of a personal residence. This commingling of the Biochem stock proceeds with Bailey's personal funds, and his expenditure of those funds for his own purposes, comprise the misappropriation of funds found by the referee.

Other stock to be forfeited, referred to as the "Japanese" stock, was liquidated by Bailey on or about July 6. However, instead of transmitting the $730,000 in proceeds directly to the United States marshal, Bailey again transferred the funds to his money market account, where they were commingled with personal funds. Bailey did not turn over the $730,000 to the United States marshal until six weeks later. The referee rejected Bailey's contention that the deposit of the proceeds from the Japanese stock into a nontrust account was the product of "inadvertent error," as the evidence demonstrated that Bailey

---

[7]The upkeep of the two French properties amounted to an average of $30,000 a month, and Bailey's obligation to pay for that maintenance would only last until the properties were sold. Bailey did not need to borrow $4 million against the stock in order to meet those maintenance obligations.

had directed the transfer from Credit Suisse to his personal account and memorialized that transfer by way of three letters to Credit Suisse.

Bailey made payments for the upkeep of the two French estates, but proceeded to use the estates for his own purposes. Although obligated to liquidate the estates and turn the proceeds over to the Federal government, Bailey wrote a memorandum to Duboc's father, dated July 18, 1994, which contained the following: "Although I am ready, willing and able to sell the property if a *bona fide* offer is made, I am certainly in no hurry. Indeed, because of its breathtaking beauty, I am disposed to return here frequently until title passes to another." He explained that he would not entertain offers significantly lower than his asking price, "As I must emphasize once more: *Je ne suis pas pressé*!" In that same memorandum, Bailey reported that he had been in contact with several potential buyers, "one of whom will allow me the use of the house for two weeks per year for ten years." Bailey contended that these references to being in no hurry to sell the estates were made strategically to counteract the notion that Duboc's properties would be sold at distress sale prices. The referee did not credit that interpretation, and concluded that Bailey deliberately procrastinated with respect to the liquidation so that he might continue to enjoy the use of his client's property.

By the fall of 1995, some eighteen months after first retaining Bailey, Duboc became dissatisfied with Bailey's representation and expressed his intention to fire Bailey and replace him with substitute counsel. Duboc requested Bailey to turn over all the funds and assets to his new counsel, two lawyers with the law firm of Coudert Brothers. As of the end of that year, Bailey had not made that requested transfer. Coudert Brothers proceeded with a motion to substitute counsel, and the motion was scheduled for hearing in front of Judge Paul on January 9, 1996.

Five days before that scheduled hearing, Bailey sent Judge Paul a letter, without copying either the prosecutors, his client, or his client's new counsel. In that letter, Bailey attempted to convince Judge Paul that the lawyers seeking to represent Duboc were not qualified to represent him; that they were giving Duboc

bad advice contrary to the strategy formulated and pursued by Bailey; and that they had a conflict of interest. He claimed that many lawyers had become interested in the case merely because "word got out that a 'multi-millionaire druggie' had been arrested." Bailey's letter opined that the prosecutors had "done their homework" so well that "[n]one of the three counts [against Duboc] was triable." He claimed that new counsel were urging Duboc to renege on his promise of cooperation, and that Duboc had violated the plea agreement in following that advice, whereas Bailey's strategy of utmost cooperation would have put Duboc "in his best light when it came to the day of final judgment" and "would have caused his release at the earliest possible date." Lawyers advising Duboc that he should have gone to trial, or that he should withhold some information so as to have something left for later in the negotiations, were, in Bailey's opinion, doing so in ignorance of the strength of the government's case. The letter closed with Bailey's express acknowledgment that it had been sent ex parte.[8] The referee concluded that Bailey had sent this letter to Judge Paul "in an effort to protect his financial stake" and only "under the guise of doing what was in the best interest of his client."

On January 12, 1996, Judge Paul issued an order relieving Bailey as counsel for Duboc and substituting the lawyers from Coudert Brothers as Duboc's new counsel. The order went on to require Bailey to submit within ten days an accounting of "the monies and properties held in trust by him for the United States of America." The accounting was to include "all monies, real and personal property and other assets obtained by him from, or for the benefit of, the defendant Duboc as well as all disbursements, liens or other payments made by him on account of or for the benefit of Claude Duboc or the United States," and expressly called for an accounting of the Biochem stock "that was delivered to Bailey to be held in trust for the United States." Judge Paul ordered that all of Duboc's assets held by Bailey were to be "frozen as of the date of this order and no further disbursement of any of these funds shall be made unless

---

[8]The closing sentence of the letter reads: "I have sent no copies of this letter to anyone, since I believe its distribution is within Your Honor's sound discretion."

authorized by this Court." Despite knowledge of that order, Bailey proceeded to spend another $309,861 of the proceeds he had borrowed against the Biochem stock, and he submitted no accounting.

Instead, on January 21, the day before the accounting was due, Bailey wrote again to Judge Paul.[9] In that letter, Bailey contended that his arrangement with the government was that he would be accountable for only the original $5.9 million value of the Biochem stock at the time it was transferred to him, but that he, Bailey, was entitled to keep as his own any appreciation in the value of the stock that had occurred since that transfer. The letter relayed Bailey's understanding that Duboc himself had now expressed a different view, namely, that any appreciation should go to the government "so that [Duboc] would get more 'credit' at the time of sentencing." Bailey threatened that, in order to "protect" himself, his client's contrary assertion as to the status of the Biochem stock would allow Bailey to "invade" the attorney-client privilege.

The prosecutors then filed an emergency motion, seeking an order that Bailey surrender all property that he held on behalf of Duboc. On January 25, Judge Paul issued such an order, requiring Bailey to appear on February 1 and to bring with him all shares of the Biochem stock. If the stock had been "replaced by any other form of asset," that replacement asset was to be brought to court. Bailey was also ordered to produce all documents pertaining to the funds and assets he held for Duboc and to "be prepared to make a full accounting" with respect to those assets. A copy of the order was served on Bailey by facsimile, by mail, and by the United States marshal.

On receipt of the January 25 order, Bailey advised the Swiss government that the Biochem shares and proceeds still in his Swiss account were the fruits of drug trafficking, which resulted in the freezing of the account.[10] He therefore did not produce the stock (or any proceeds) as ordered by the court. Judge Paul

---

[9]Unlike the earlier ex parte communication to Judge Paul, a copy of Bailey's January 21 letter was served on the assistant United States attorney.

[10]By that time, Bailey had sold 202,000 of the Biochem shares and reduced the balance on the outstanding loan. He still had 400,000 Biochem shares in the Swiss account at the time he arranged for the account to be frozen.

held a contempt hearing on February 2, at which Bailey testified, under oath, that he had not seen either the January 12 or the January 25 order until the morning of February 2. Given abundant evidence that Bailey had in fact received both orders well prior to that date,[11] the referee concluded that Bailey's testimony before Judge Paul (and his identical testimony during the bar discipline hearing) was false. Bailey was held in contempt for his failure to produce the stock or its substitute proceeds, and was incarcerated for forty-four days until he restored $2.3 million to the court.[12]

Based on these facts, the referee found by clear and convincing evidence that Bailey violated the following provisions of the Rules Regulating the Florida Bar: Rules 3-4.3 (conduct unlawful or contrary to honesty and justice); 4-1.6(a) (disclosure of information relating to representation of client); 4-1.7(b) (independent or professional judgment in representation materially limited by lawyer's own interest); 4-1.8(a) (acquisition of ownership, possessory, security, or other pecuniary interest adverse to client); 4-1.8(b) (use of information to disadvantage of client); 4-1.15(a) (commingling of client's funds with lawyer's own); 4-3.3(a)(1) (false statement to tribunal); 4-3.4(c) (knowing violation of rules of tribunal); 4-3.5(a) (attempt to influence judge, juror, prospective juror, or other decision maker); 4-3.5(b) (communication as to merits of case with judge

[11]An associate of Bailey's confirmed that the January 12 order had been sent by facsimile transmission to Bailey's office the day it was issued; that it was sent by facsimile transmission to Bailey's residence the next day; and that she had discussed the order with Bailey on January 15. She recalled Bailey's being concerned that the prosecutors had obtained the January 12 order ex parte. Bailey also discussed the terms of the order with the prosecutors prior to and during a meeting he had with them on January 19. Finally, Bailey's own January 21 letter to Judge Paul referenced the January 12 order, and claimed that he had been attempting to gather documents in order to comply with that order. As to the January 25 order, service by three separate methods (facsimile, mail, and personal service by the United States marshal) ensured that Bailey did indeed receive it. Bailey's testimony that he had not seen either the January 12 order or the January 25 order until the morning of February 2 was characterized by the referee as "patently ludicrous."

[12]Ultimately, the court approved $1.2 million of the expenses incurred by Bailey in managing Duboc's assets. However, an additional $423,738 in claimed expenses was disallowed, and Bailey was ordered to return that additional amount to the court. See *United States* v. *Bailey*, 175 F.3d 966, 968 (11th Cir. 1999). Bailey never made any application for attorney's fees.

or official); 4-8.4(a) (violation of Rules of Professional Conduct); 4-8.4(b) (criminal misconduct); 4-8.4(c) (dishonesty, fraud, deceit, or misrepresentation); 4-8.4(d) (conduct prejudicial to administration of justice); and 5-1.1 (property entrusted to attorney for specific purpose held in trust must be applied only to that purpose).[13]

b. *Misappropriation of the Biochem stock.* Bailey contends that the agreement reached between himself, Duboc, and the prosecutors was that he would be accountable up to the original value of the Biochem stock as of the date it was transferred to him ($5.9 million), from which he was to pay for the upkeep of the two estates and could seek to collect his fee (if approved by Judge Paul), but that he would be allowed to keep for himself any appreciation in the value of the stock that occurred after the date of the original transfer. Thus, he argues, because the stock appreciated dramatically,[14] his transfer of stock proceeds to his own personal account and his use of those proceeds for his own personal expenses was simply the use of his own monies, not any misappropriation of client funds.

Among other defects, this argument ignores the actual

---

[13]Analogous provisions of the Canons of Ethics and Disciplinary Rules Regulating the Practice of Law, S.J.C. Rule 3:07, 382 Mass. 768 (1981), as amended, 422 Mass. 1301 (1996), are as follows: DR 1-102 (A) (4)-(6) (dishonesty, deceit, misrepresentation or fraud; conduct prejudicial to administration of justice; conduct adversely reflecting on lawyer's fitness to practice law); DR 4-101 (B) (revealing confidences or secrets of client; use of confidence or secret of client to disadvantage of client; use of confidence or secret to attorney's own advantage); DR 5-101 (A) (lawyer's own interests affecting judgment on behalf of client); DR 5-103 (A) (acquisition of proprietary interest in subject matter of litigation); DR 5-104 (A) (business relationship with client with differing interests therein); DR 5-105(A) (exercise of lawyer's professional judgment on behalf of client adversely affected; representation of differing interests); DR 7-106 (C) (5) (compliance with customs and practices of tribunal); DR 7-110 (B) (improper ex parte communications with judge or official); and DR 9-102 (lawyer must deposit client and third party property and funds in designated IOLTA or special trust account, promptly account for funds, and turn over funds when due without delay). As Bailey's misconduct occurred prior to January 1, 1998, the Canons of Ethics and Disciplinary Rules Regulating the Practice of Law apply to this case. See S.J.C. Rule 3:07, as appearing in 426 Mass. 1303 (1998) (replacing Canons of Ethics and Disciplinary Rules with Massachusetts Rules of Professional Conduct).

[14]As of January, 1996, the value of the stock had risen by approximately $10 million.

chronology of events. Immediately following his receipt of the shares, Bailey borrowed against the stock and transferred the proceeds to his personal accounts. Yet, through the summer and fall of 1994, Bailey acknowledged that the stock "showed little movement." If the understanding had been that any appreciation in value was Bailey's own money, that would mean that Bailey could not withdraw any proceeds for himself until at least such time as some appreciation occurred. More reasonably, given that stock may unpredictably rise and fall in value, it would mean that no funds would actually belong to Bailey until a final accounting at the conclusion of Bailey's services revealed that there was in fact some appreciation in value as of that date.[15] As such, Bailey's immediate use of the funds for his own purposes could not be justified by his purported entitlement to the subsequent "appreciation." As the Supreme Court of Florida observed, "from the day [the Biochem stock] was transferred to him, Bailey treated the money as his own." *Bailey, supra* at 691. It was thus misappropriation of funds, even if one placed credence in his "appreciation" theory.

Moreover, the record amply justified the referee's conclusion that the entirety of the stock and its proceeds, including any appreciation in value, were subject to a trust while in Bailey's keeping. Bailey claims that no "trust" could have been formed where there were no documents creating any such "trust," the transfer documents made no mention of any "trust," and the word "trust" was not used in any discussions leading up to that transfer. The existence of an attorney's fiduciary obligations with respect to client funds does not depend on any express use of the term "trust" or on the execution of a formal "trust" document.[16] Here, it is undisputed that Duboc's transfer of the Biochem stock to Bailey was not intended as a gift or as pay-

---

[15]Bailey's own letter to Judge Paul noted that "[m]any start-up pharmaceutical companies had gone bankrupt when their products either did not work, or could not win FDA approval," and his brief acknowledges that the "volatility of small biopharmaceutical companies is notorious." Bailey could not claim to own (and spend) the value of any "appreciation" that might well evaporate by the time of his final accounting.

[16]Rule 4-1.15 of the Rules Regulating the Florida Bar expressly provides that "[a] lawyer shall hold in trust, separate from the lawyer's own property, funds and property of clients or third persons that are in a lawyer's possession in connection with a representation." Similarly, Rule 5-1.1(b) provides:

ment of fees. Rather, the stock was transferred to Bailey for specific purposes — i.e., for the upkeep of the French properties, with the remainder to be forfeited to the United States pursuant to Duboc's plea agreement in the hope that that voluntary (and massive) forfeiture would improve Duboc's position at the time of sentencing. The United States had agreed that it would not oppose Bailey's request that Judge Paul award him a reasonable fee to be paid from that remainder, notwithstanding that the stock was forfeitable as drug proceeds. Those were the only purposes identified when the stock was entrusted to Bailey's keeping.

Indeed, despite his protest that no one used the term "trust" at the time these agreements were made, Bailey acknowledged in his January 21 letter to Judge Paul that the original value of the stock was held by him "in the nature of a trust." His theory that somehow that "trust" did not extend to the entire value of the asset transferred to him was not supported by any other witness, and was expressly disclaimed by Bailey's cocounsel and by the prosecutors. Duboc's written plea agreement (unambiguously committing Duboc to forfeit "all drug related assets" and stating that there were "no other agreements" between Duboc and the United States attorney) is wholly inconsistent with any understanding that some forfeitable asset was being exempted from forfeiture and transferred to Bailey as Bailey's own. Judge Paul, to whom the arrangement was presented at the time of Duboc's plea, apparently understood that Bailey held the entirety of the assets in trust, as he used that precise term when he ultimately ordered Bailey to render an accounting.

At other times during the course of the representation, Bailey implicitly acknowledged that he had no right to the stock itself, only the right to seek recovery of fees from the stock if and when Judge Paul approved a motion for fees. In May, 1995, when some disagreement erupted between Bailey and cocounsel, he wrote, "I could have at this point rejected the silly conditions offered [by cocounsel], applied for a healthy fee to Chief Judge Paul, and turned the balance of the Biochem stock

"Money or other property entrusted to an attorney for a specific purpose, including advances for fees, costs, and expenses, is held in trust and must be applied only to that purpose."

back to the Government." He also assured Duboc that he, Bailey, would "be paid with Chief Judge Paul's approval — only that amount which is commensurate with the result achieved in your case, and the amount of the work that went into it." There is no evidence that Bailey ever told Duboc that, in addition to those precisely calculated and judicially approved fees, he would also be paid whatever amount the market generated for the Biochem stock.

The referee concluded that Bailey contrived his theory about his entitlement to the appreciated value of the stock only when his client sought to change counsel and have the assets transferred to new counsel. Given that none of the other participants in and witnesses to the original agreement (the prosecuting attorneys, Duboc, two cocounsel, and Judge Paul) had any understanding that Bailey would be entitled to the appreciated value of the stock, the referee had an adequate basis for concluding that Bailey's theory was a concoction belatedly raised to retain possession of the stock proceeds and deflect the problems he knew he would have in accounting for his various uses of the stock proceeds. There was sufficient evidence to support the finding that Bailey had misappropriated client funds, commingled them with his own funds, and used them for his own purposes.[17]

4. *Appropriate sanction.* On a matter of reciprocal discipline,

---

[17]We need not deal with Bailey's argument that the more complete record developed at the trial of his contract claim against the Federal government should undermine our confidence in the soundness of the referee's findings on the issue of his misappropriation of funds. While Bailey's brief was rife with the expectation that that contract action would ultimately prove his entitlement to the appreciated value of the stock, that trial has now concluded, and the Court of Federal Claims has rejected Bailey's contract claim. *Bailey* v. *United States*, 54 Fed. Cl. 459, 498 (2002). In that action, Bailey waived his claim as to any express contract, and proceeded solely on the theory that his dealings with the prosecutors had given rise to an implied contract. *Id.* at 483. As to that theory, the judge found that the prosecutors had not intended or agreed that Bailey was to have the appreciated value of the stock, and that it would have been "incongruous" for them to have made any such agreement. Specifically, it would have been contrary to the prosecutors' experience with Judge Paul (who was "famous" for insisting that all proceeds of drug trafficking be forfeited), contrary to the express understanding that any compensation for Bailey would have to be approved by Judge Paul, and contrary to Duboc's stated purpose in not forfeiting the stock immediately so as to maximize the total amount of his forfeitures and improve his posture at sentencing. *Id.* at

"we may impose whatever level of discipline is warranted by the facts even if that discipline exceeds, equals, or falls short of the discipline imposed in another jurisdiction." *Matter of Watt,* 430 Mass. 232, 234 (1999). Nor are we bound by the single justice's assessment of appropriate discipline. Rather, we review the question de novo to ensure that the discipline imposed by the single justice is not markedly disparate from that ordered in comparable cases. See *Matter of Goldberg,* 434 Mass. 1022, 1023 (2001), and cases cited.

Disbarment or indefinite suspension is the presumptive sanction for intentional use of fiduciary funds with either the intent to deprive or with actual deprivation resulting. See *Matter of Watt, supra* at 234-235; *Matter of Schoepfer,* 426 Mass. 183, 187 (1997); *Matter of Elias,* 418 Mass. 723, 725 (1994); *Matter of the Discipline of an Attorney,* 392 Mass. 827, 836 (1984). Bailey contends that his use of the Biochem stock proceeds did not constitute intentional misappropriation of fiduciary funds because, as illustrated by his pursuit of his contract claim, he had a "colorable claim of right" to those funds. He analogizes his use of the funds under a "colorable claim" to a lawyer's taking a premature or excessive fee, which would normally result in public reprimand. See *Matter of Fordham,* 423 Mass. 481, 495 (1996), cert. denied, 519 U.S. 1149 (1997); *Matter of Kerlinsky,* 406 Mass. 67, 76 (1989), cert. denied, 498 U.S. 1027 (1991).[18] We are unpersuaded. The referee's conclusion that Bailey's claim to the proceeds of the appreciated stock was a

---

488-495, 498, 508. No matter how thorough the record, Bailey's claim concerning his alleged entitlement to the appreciated value of the stock ultimately founders on the fact that he can articulate no conceivable reason why Duboc, the prosecutors, or Judge Paul would ever have agreed to an arrangement whereby, in addition to whatever reasonable fees were allowed, Bailey would be able to keep for himself a valuable asset that was clearly forfeitable to the United States. Indeed, the Court of Federal Claims judge stopped short of even finding that Bailey's professed belief in his claimed agreement was sincerely held, noting only that it was "perhaps his perception" that he had such an agreement. *Id.* at 508.

[18]Bailey's suggestion in his brief that his use of those stock proceeds was *actually* the taking of a fee is a theory that does not appear to have been raised before the referee. It also appears contrary to the abundant evidence concerning the need to obtain approval from Judge Paul before any fees could be paid from a forfeitable asset.

contrivance, concocted to explain his inability to account for funds that he had long since spent, belies his argument that the misappropriation was unintentional. Moreover, as outlined above, Bailey used the stock proceeds for his own purposes before there was any "appreciation" that, even under his theory, would arguably have belonged to him. The misappropriation was intentional.

The misappropriation also resulted in actual deprivation. "Deprivation arises when an attorney's intentional use of a client's funds results in the unavailability of the client's funds after they have become due, and may expose the client to a risk of harm, even if no harm actually occurs." *Matter of Watt, supra* at 236. See *Matter of Carrigan*, 414 Mass. 368, 373 n.6 (1993) (deprivation occurs "whenever an attorney uses client funds for unauthorized purposes after the time these funds are due and payable"). Here, the funds became "due" at the very latest when the court ordered that they be produced.[19] Bailey continued to spend them, and, as to the stock still remaining in Bailey's Swiss account, Bailey saw to it that the account would be frozen immediately prior to the court-imposed deadline for production of the stock. He was thus unable to produce the assets, having deliberately rendered himself unable to do so.

Bailey contends that his client was not deprived of any funds because he had already committed to forfeit the entirety of his funds to the United States government. The argument ignores the very purpose for which his client had agreed to that forfeiture. The strategy — devised by Bailey, and described by him as the only viable option for his client — was to overwhelm the prosecutors and the sentencing judge with his "stunning" and "extraordinary" cooperation in the forfeiture of his assets. While Duboc would never regain possession of those assets, they had potential value to him as part of that strategy. The image of utmost cooperation that Bailey had advised Duboc to cultivate was destroyed when Bailey claimed the appreciated value of the stock and proceeds for himself and disobeyed court

[19]The client previously had requested that the assets held by Bailey be turned over to new counsel.

orders to produce the stock and proceeds. Bailey's intentional use of the funds resulted in actual deprivation.[20]

The presumption of disbarment or indefinite suspension that flows from Bailey's misappropriation of client funds is bolstered by the seriousness of Bailey's additional misconduct. An attorney's giving false testimony under oath, by itself, can justify disbarment. See *Matter of Budnitz*, 425 Mass. 1018, 1019 (1997), and cases cited. Here, Bailey lied under oath before Judge Paul. He offers as mitigation a theory that his false testimony was not material to the proceedings before Judge Paul because Judge Paul was insisting that the stock be turned over and did not care why it had not been turned over. The "materiality" of false testimony is not measured by one's hindsight perception whether that testimony was persuasive. At a hearing to determine whether Bailey's failure to comply with two court orders was contemptuous, Bailey's prior awareness of the orders (or lack thereof) was highly material. The fact that the false testimony did not affect Judge Paul's insistence that the funds be turned over as ordered does not serve to mitigate the seriousness of this violation.

Further compounding Bailey's multifaceted misconduct in this matter is his violation of court orders, see *Matter of Cohen*, 435 Mass. 7 (2001); his deliberate ex parte communication with the judge in an attempt to influence the ruling on a pending motion; his statements in letters to the judge revealing client confidences (and threatening to reveal more), in a manner that was disparaging to his client, and for the purpose of furthering Bailey's own interests contrary to his client's desire to change counsel[21]; his knowing commingling of other funds (the proceeds from the liquidation of Duboc's Japanese stock); and his self-dealing in delaying the sale of Duboc's property so that

[20]That Duboc's new counsel had a different strategy, and that Duboc engaged in subsequent misconduct irreparably damaging his chances for leniency in sentencing, does not change the fact that Bailey's inability to produce the funds deprived his client of the benefit of those funds.

[21]Bailey seeks to minimize the gravity of the violations stemming from his letters to Judge Paul by asserting that Judge Paul never read them. Assuming that to be the case, that fact would not mitigate the seriousness of Bailey's misconduct in sending those letters. Bailey's fitness to practice law is measured by his own conduct, not by Judge Paul's sound practice of refusing to read correspondence concerning pending cases. Bailey, apparently unaware of

he could continue to use the estate himself. As the Florida Supreme Court observed when reviewing the cumulative instances of misconduct proved against Bailey, "Bailey has committed some of the most egregious rules violations possible, evidencing a complete disregard for the rules governing attorneys." *Bailey, supra* at 694.

Bar counsel appropriately cites as aggravating factors Bailey's failure to recognize or appreciate the wrongful nature of his serious misconduct, see *Matter of Eisenhauer*, 426 Mass. 448, 455, cert. denied, 524 U.S. 919 (1998); his lack of candor before the referee (to whom he repeated his false testimony), see *Matter of Friedman*, 7 Mass. Att'y Discipline Rep. 100, 103 (1991); the self-interest that permeates the various violations, see *Matter of Pike*, 408 Mass. 740, 745 (1990); the cumulative effect of the multiple violations, see *Matter of Saab*, 406 Mass. 315, 326-327 (1989); and Bailey's record of prior discipline, see *Matter of Dawkins*, 412 Mass. 90, 96-97 (1992), and cases cited.[22]

We see nothing in mitigation. That Bailey has had a long and highly successful career — as attested by those who submitted letters to the Board of Bar Overseers urging it not to seek Bailey's disbarment — does not mitigate these multiple violations. Our standards of ethical practice apply to all attorneys, whether they are well known for their victories in high-profile cases or whether they practice law in quiet obscurity. If anything, the fact that Bailey committed such grave misconduct despite his vast experience as a seasoned litigator only serves to heighten the seriousness of his offenses. The Supreme Court of Florida determined that Bailey's "egregious and cumulative misconduct, and the absence of any mitigating factors" made disbarment "not only appropriate . . . but necessary to fulfill the . . . purpose of attorney discipline." *Bailey, supra* at 695. We agree.

We therefore affirm the judgment of the single justice.

*So ordered.*

Judge Paul's practice at the time, clearly intended that Judge Paul read the letters.

[22]That discipline, a public censure, was imposed more than thirty years ago. Although properly noted by bar counsel as a factor in aggravation, it is not necessary to our conclusion that disbarment is warranted today.