# United States Court of Appeals

## For the First Circuit

No. 05-2779

IN RE: F. LEE BAILEY,

Appellant.

APPEAL FROM A PANEL OF THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]
[Hon. George A. O'Toole, Jr., U.S. District Judge]
[Hon. Morris E. Lasker,[*] Senior U.S. District Judge]

Before

Selya, Circuit Judge,

Hug,[**] Senior Circuit Judge,

and Howard, Circuit Judge.

Joseph J. Balliro, with whom Balliro & Mondano was on brief, for respondent.

June 9, 2006

---

[*]Of the Southern District of New York, sitting by designation.

[**]Of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

**Per Curiam**.  The State of Florida and the Commonwealth of Massachusetts have stricken from the roll of lawyers admitted to practice before the court Attorney F. Lee Bailey for, inter alia, misappropriating client funds.  See In re Bailey, 786 N.E.2d 337 (Mass. 2003); Fla. Bar v. Bailey, 803 So.2d 683 (Fla. 2001).  A three-judge panel of the United States District Court for the District of Massachusetts subsequently ordered Bailey disbarred under its reciprocal discipline rule.  See Mass. L.R. 83.6(2)(D). We affirm.

Before addressing the merits of Bailey's appeal, we briefly consider the basis for appellate jurisdiction over a district court's decision to discipline a member of its bar.  See Garcia-Velazquez v. Frito Lay Snacks Caribbean, 358 F.3d 6, 8 (1st Cir. 2004) (stating that an appellate court has a duty in every case to satisfy itself of subject matter jurisdiction).  An attorney discipline proceeding under a reciprocal discipline rule is a case or controversy under Article III.  See In re Calvo, 88 F.3d 962, 965-66 (11th Cir. 1996); In re Palmisano, 70 F.3d 483, 484-85 (7th Cir. 1995).  Moreover, a district court's decision disbarring an attorney from practice is a final judgment as it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."  Catlin v. United States, 324 U.S. 229, 233 (1945).  We therefore join other circuits in concluding that we have jurisdiction under 28 U.S.C. § 1291 to review a final

-2-

order disbarring an attorney. See In re Martin, 400 F.3d 836, 840 (10th Cir. 2005); In re North, 383 F.3d 871, 874-75 (9th Cir. 2004); In re Surrick, 338 F.3d 224, 229 (3d Cir. 2003).

Turning to the merits, Bailey argues that the district court erred by declining to convene a hearing to allow him to present new evidence. He contends that the court should have accepted his new evidence because it undermines the factual predicate for the state court disbarment orders. The district court declined to convene such a hearing on the ground that, even if it accepted the new evidence, the evidence would not sufficiently undermine the state court rulings to warrant relief.

Bailey's discipline proceeding was governed by Local Rule 83.6(2)(D) which provides:

> [The district court] shall impose the identical discipline unless the respondent-attorney demonstrates, or [the district court] finds, that upon the face of the record upon which the discipline in another jurisdiction is predicated it clearly appears:
>
> (i) that the proceeding was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or
> (ii) that there was such an infirmity of proof establishing the misconduct as to give rise to the clear conviction that [the district court] could not, consistent with its duty, accept as final the conclusion on the subject;
> (iii) that the imposition of the same discipline by this court would result in grave injustice; or
> (iv) that the misconduct established is deemed by [the district court] to warrant substantially different discipline.

This rule recognizes that "disbarment by [a state] does not result in automatic disbarment by the federal court." In re Ruffalo, 390 U.S. 544, 547 (1968). But, in the interest of avoiding relitigation of matter previously adjudicated by other tribunals, it also provides appropriate deference to the original state proceeding by limiting federal court review to determining only that the state proceeding complied with due process, that there was adequate proof of misconduct, and that imposing reciprocal discipline would not result in a grave injustice. See Theard v. United States, 354 U.S. 278, 282 (1957). Given the limited nature of a reciprocal discipline proceeding in federal court, "there is no entitlement to a de novo trial . . . ." Surrick, 338 F.3d at 232.

The Local Rule provides that a reciprocal discipline proceeding is based on "the record upon which the discipline in another jurisdiction is predicated." Mass. L.R. 83.6(2)(D). The Rule does not explicitly provide for an evidentiary hearing. We therefore agree with the district court that holding such a hearing in a reciprocal discipline matter would be "extraordinary." In re Bailey, No. 02-10093, 2005 WL 2901885, at *3 (D. Mass. Nov. 1, 2005). We review the district court's decision not to hold an evidentiary hearing for an abuse of discretion. Cf. United States v. Jimenez, 419 F.3d 34, 42 (1st Cir. 2005) (reviewing district's order declining to hold evidentiary hearing on a motion to suppress for an abuse of discretion); Bank One Texas, N.A. v. Montle, 964

-4-

F.2d 48, 51-52 (1st Cir. 1992) (reviewing district court's order declining to hold an evidentiary hearing on motion to dismiss for lack of subject matter jurisdiction for an abuse of discretion); United States v. Garcia, 954 F.2d 12, 19 (1st Cir. 1992) (reviewing district court's denial of motion for an evidentiary hearing in sentencing proceeding for an abuse of discretion); Jackson v. Fair, 846 F.2d 811, 819 (1st Cir. 1988) (reviewing district court's denial of a motion to hold evidentiary hearing on a request for a preliminary injunction for a clear abuse of discretion).[1]

Summarized succinctly, the evidence that Bailey misappropriated client funds is as follows. In 1994, Claude Duboc was indicted by a federal grand jury for drug smuggling and money laundering. Duboc earned hundreds of millions of dollars by running drugs, and the government sought forfeiture of all of Duboc's drug proceeds as part of the prosecution. Duboc's assets included two mansions in France.

Duboc hired Bailey to represent him in the criminal matter. Recognizing the strength of the government's case against his client, Bailey pursued a strategy of pledging Duboc's utmost cooperation in forfeiting his assets in the hope that the court would credit him at sentencing for his cooperation. It soon became apparent that there would be difficulty in forfeiting the French

---

[2]Bailey argues for de novo review but cites no supporting authority.

-5-

mansions because the federal government could not undertake to maintain the properties pending their sale. To facilitate the forfeiture, Bailey volunteered to maintain the properties, arrange for their sale, and turn the sale proceeds over to the government. To provide Bailey with the requisite funds to maintain the properties and to establish a potential pool of money from which Bailey could recover his fees, the prosecutors proposed that one of Duboc's cash accounts (which held approximately $3.5 million) be turned over to Bailey.

Simultaneously, questions arose over the forfeiture of 602,000 shares of stock that Duboc owned in a company called Biochem Pharma (Biochem). At the time, Biochem was involved in promising drug research that could result in the stock increasing in value. But there was concern that the immediate liquidation of Duboc's substantial holdings of the company could depress its value. To avoid this problem, Bailey and the prosecutors agreed that, instead of the cash account, the Biochem stock would be transferred to Bailey to pay for the upkeep of the mansions and to provide a source from which he could draw fees. It was also understood, however, that Bailey would not be entitled to fees without approval from the court and that Bailey bore the risk that the Biochem stock would decrease in value, which, if it occurred, would deprive Bailey of assets to maintain the mansions or to collect his fees. In accord

with these understandings, the Biochem stock (then valued at about $6 million) was transferred to Bailey's Swiss bank account.

Approximately a week after the transfer, Bailey borrowed over $4 million against the Biochem shares. He then proceeded to transfer all but $350,000 from that account to his personal checking account. He used these proceeds to spend over $2.2 million on his private businesses and personal expenses. This commingling of the Biochem stock proceeds with his personal assets was the basis for the finding that Bailey misappropriated client funds.

Bailey contends that his deal with the government allowed him to keep the value of the stock's appreciation that occurred after the date of transfer, and therefore he was responsible only to maintain the initial $6 million value of the stock.[2] Bailey argues that he could introduce evidence that the stock was not given to him to hold in "formal trust," which he claims would support his argument that he owned the appreciated value of the Biochem stock in fee simple absolute.

The record contains documentary evidence to support the conclusion that Bailey was not entitled to the personal use of the stock on the date of the transfer. Most damaging to Bailey is his acknowledgment that he was only entitled to fees that were approved by the court. When a dispute arose between Bailey and his co-

---

[2]Two years after the transfer, the stock had increased in value by $4 million.

-7-

counsel, Bailey wrote to co-counsel, "I could have at this point rejected the silly conditions offered by [co-counsel] and applied for a healthy fee to [the court] and turned the balance of the Biochem stock back to the Government." He also told Duboc that he, Bailey, "would be paid with [the court's] approval only that amount which is commensurate with the result achieved in your case, and the amount of the work that went into it." Even subsequent to the criminal proceedings, Bailey continued to acknowledge that the district court had "the final say on fees." Yet the evidence is undisputed that Bailey took possession of the stock as his personal property well in advance of any fee award by the court and that he never told anyone that he was entitled to the appreciated value of the stock in addition to the judicially-approved fees.

As mentioned above, Bailey seeks to undermine this evidence of misappropriation by presenting proof that there was no "formal trust" for his possession of the stock.[3] But, even assuming that Bailey could prove that the stock was not transferred to him in trust, such proof would not adequately undermine the states' rationale for disbarment. The district court declined to hold a hearing to consider Bailey's new evidence because it correctly

---

[3]Bailey says that he could produce testimony from government attorneys involved in the Duboc prosecution that the word "trust" was not used in arranging the stock transfer and that the Internal Revenue Service has since characterized the stock as "income" on the date of the transfer which, Bailey argues, is inconsistent with a finding that the stock was held in trust.

recognized that neither the Florida nor Massachusetts decisions "hinged on the creation of a formal trust." Bailey, 2005 WL 2901855, at *3; see also Bailey, 786 N.E2d at 347-48; Bailey, 803 So.3d at 692. Instead, these decisions were predicated on the determination that "Bailey had no reasonable basis to believe that he could draw the value of the shares to pay attorneys fees as the case went on without prior court approval." Id.; see also Bailey, 786 N.E.2d at 348 n.17 (rejecting Bailey's request for an evidentiary hearing on similar basis). Given that the evidence provides a sound basis for concluding that Bailey used the stock proceeds for personal use without the required court approval, the district court was within its discretion in concluding that no evidentiary hearing was necessary because the new evidence would not establish such an "infirmity of proof" that relief would be available under Local Rule 83.6(2)(D).[4]

**Affirmed**.

---

[4]Bailey's argument that he owned the appreciated value of the stock is also inconsistent with his actual dealings with the stock. Bailey acknowledges that, in the initial months after he received the stock, its value did not increase. "If the understanding had been that any appreciation in value was Bailey's own money, that would mean that Bailey could not withdraw any proceeds for himself until at least such time as some appreciation occurred." Bailey, 786 N.E.2d at 347. Yet, "from the day the Biochem stock was transferred to him, Bailey treated the money as his own." Id.